The State, ex rel. Leis, Appellee, v. William S. Barton
Co., Inc., et al., Appellants.

[Cite as State, ex rel. Leis, v. William S. Barton
Co. (1975), 45 Ohio App. 2d 249.]

(No. C-74277—Decided September 15, 1975.)

*Mr. Simon L. Leis, Jr.*, and *Mr. Arthur Ney*, for appellee.

*Mr. Andrew B. Dennison*, for appellant Terry L. Barnett.

*Mr. Allen Brown*, for appellant William S. Barton Co., Inc.

*Per Curiam.* This cause came on to be heard upon the appeal; the transcript of the docket, journal entries, and original papers from the Hamilton County Common Pleas Court; the transcripts of the proceedings; the exhibits; and the assignments of error, briefs and arguments of counsel.

The defendants, Terry Barnett and the William S. Barton Company, appellants herein, at all times pertinent to this appeal, were the lessee and lessor respectively of the Adult Book Store located at 721 Vine Street in Cincinnati. On March 29, 1974, the Hamilton County prosecuting attor-

ney filed this civil action against them to abate a nuisance consisting of the sale of allegedly obscene material at that location. A trial was had, and included in the evidence there adduced were six magazines and two films, all of which were found to be obscene by the trier of fact. Thereafter, in accordance with the statutory "padlock" scheme of R. C. 3767.01 *et seq.*, and pursuant to a judgment entered in favor of the prosecutor on May 22, 1974, the store was closed by order of court for a period of one year.

Immediately following the closure order, defendants filed a motion purporting to invoke the release provisions of R. C. 3767.04, and thereby seeking to continue sales operations at the store during the pendency of this appeal. That motion was denied on May 22 after a hearing of even date.

In the interim, however, the defendant had filed an injunctive action in federal court seeking to prevent the state from proceeding against them in the instant cause. When that litigation ended on August 28 in the decision of a three-judge panel upholding[1] the constitutionality of the Ohio nuisance abatement laws and dismissing the federal complaint, the Barton Company (having found another tenant) again sought relief from the closure order. In state proceedings which commenced on October 24, the lessor company demonstrated to the satisfaction of the court its compliance with the statutory requirements for

---

[1] A collateral matter in this cause has concerned itself with the vacation of judgment and remand from the Supreme Court of the United States to the U. S. Court for the Southern District of Ohio of the decision of the three-judge panel in the booksellers' action seeking to enjoin the state proceeding against them. At the request of this court, the parties filed supplemental briefs on the related questions of res judicata and comity, and of the ripeness of this appeal in light of the federal remand. We have concluded that the doctrine of federal abstention is applicable where, as here, state proceedings have not been exhausted and there is no evidence or allegation of such prosecutorial bad faith or harassment as might constitute a basis for an exception to the rule. *Hicks* v. *Miranda*, 43 U. S. L. W. 4857 (June 24, 1975) and cases cited therein. Accordingly, we proceed to the merits of the instant appeal.

reopening padlocked premises before the year of closure had run. The lessee, Barnett, having formally abandoned his interest in the premises because of the impact of the closure itself, was neither a party to nor present at these later proceedings. The court thereupon, and without objection from the Barton Company, as to the terms of the covenant of abatement,[2] granted the company's application to reopen the premises, releasing the order of closure by entry of December 30.

That action notwithstanding, both defendants perfected timely appeals from the judgment below and the closure order of May 22, and present herein for our review six joint assignments of error. Stripped of their redundant or plainly unmeritorious aspects and thus reduced to that which is both relevant and essential, these raise two questions which we deem critical to a disposition of the cause: (1) whether the terms of the covenant to abate, insisted upon by the trial court, included an impermissible prior restraint in violation of the First and Fourteenth Amendments to the United States Constitution and to the Ohio Constitution; and (2) whether the trial court's blanket exclusion of evidence as to "contemporary community standards" and "prurient appeal" was prejudicial error.

Before proceeding to a discussion of these questions, we note the presence of an issue raised *sua sponte* by the Court, and argued by supplemental briefs submitted by counsel, consisting of the possible mootness of the questions on appeal resulting from the post-judgment application for release from the closure order by the Barton Company, the trial court's grant thereof, and defendant Barnett's abandonment of his leasehold interest, together with the fact of the expiration of the year of closure. *State* v. *Wilson* (1975), 41 Ohio St. 2d 236. We conclude, however, that since stays of execution pending appeal are not possible in cases of this sort,[3] a defendant's only access to

---

[2] See discussion in text, part I, *infra*.

[3] *State, ex rel. Ewing,* v. *Without A Stitch* (1974), 37 Ohio St. 2d 95, 104.

judicial relief during the year following a closure order lies in the release provisions of R. C. 3767.04, which serve the role, among other things, of substitutes for stays pending a resolution of an appeal. To hold, under these circumstances, that a defendant who avails himself of this remedy thereby forsakes his right to appellate review of the rectitude of the judgment and closure order itself would, in our view, not only shrink the meaning of the due process clause, but would suggest an indirect curtailment of certain individual rights protected by the First Amendment, which is of equal importance. Accordingly, we hold on this score that none of the factual occurrences post-dating the order complained of in the instant cause terminated the defendant's right of appeal.

## I.

The issue of whether R. C. 3767.01 *et seq.* affects an unconstitutional prior restraint of the First Amendment rights of freedom of speech and press was decided by the Supreme Court of Ohio in *State, ex rel. Ewing,* v. *Without a Stitch* (1974), 37 Ohio St. 2d 95. Stated simply, the statutory scheme in question provides for the closure, for a period of one year, of premises judicially determined to have been the site of a nuisance. Where the asserted nuisance is the sale or exhibition of obscene literature, or other material arguably protected by the First Amendment, a judicial determination of obscenity must be had as a condition precedent to the declaration of a nuisance. In determining whether or not given materials are indeed obscene, the trier of fact must be guided by the definitions of the criminal code, which have been held to comport with the constitutional standards of *Miller* v. *California* (1973), 413 U. S. 15. *State, ex rel. Keating,* v. *Vixen* (1973), 35 Ohio St. 2d 215.[4]

Following the mandatory closure order which is issu-

---

[4] R. C. 2905.34, the section of the criminal code addressed in *Vixen, supra,* has since been replaced by R. C. 2907.01, in which obvious attention has been given to the *Miller* standards. We apprehend no reason why these current criteria are not similarly applicable to R. C. 3767.01 *et seq.*

ed as a consequence of the findings of obscenity and nuisance, the defendant may make an application for release from the closure order pursuant to R. C. 3767.06 and 3767.-04. The significance of the release provisions in deciding the prior restraint question cannot be overemphasized. The Supreme Court of the United States noted their importance in a recent decision on a collateral matter under the Ohio padlock laws, as follows:

"In *'Without a Stitch'* it was decided that the closure provisions of the Ohio Rev. Code Ann. §3767.06 were applicable even if a theatre had shown only one film which was adjudged to be obscene. However, the Ohio Supreme Court was concerned with the constitutional implications of prior restraint of films which had not been so adjudged. In narrowing the statute the court noted that § 3767.04 specifies conditions under which a release may be obtained from the closure order: the property owner must appear in court, pay the cost incurred in the action, file a bond in the full value of the property, and demonstrate to the court that he will prevent the nuisance from being re-established. The Court then made this critical clarification: 'The nuisance is the exhibition of the particular film declared obscene. *The release provisions do not, as appellants contend, require the owner to show that no film to be exhibited during the one-year period will be obscen*e. Such a requirement would not only be impossible, as a practical matter, but would also be an unconstitutional prior restraint. * * *' 37 Ohio St. 2d, at 105, 307 N. E. 2d, at 918." *Huffman* v. *Pursue, Ltd.*, 43 U. S. L. W. 4379, 4385, note 23 (Mar. 18, 1975). (Emphasis added.)

Thus, we arrive at defendants' major premise, which we find to be well taken, and upon which this aspect of the appeal is founded: that, but for their release from the closure provision, the Ohio padlock statutes would impose an unconstitutional prior restraint, and that such unconstitutionality can be avoided only where the terms of a defendant's covenant to abate are narrowly confined to materials which have already been judicially determined to be obscene.

The defendants' minor premise in the instant cause turns on the arguably improper terms of the covenant to abate insisted upon by the trial court in granting the release from closure. The permissible limits of the restriction are contained in the language of the fifth paragraph of the syllabus of *Without a Stitch*, as follows:

"The one-year closing order mandated by R. C. 3767.06 must be released by the trial court if the owner of the premises pays the cost of the abatement action, files a bond in the full value of the property, and demonstrates to the court *that he will not exhibit the particular film or films* declared to be obscene." (Emphasis added.)

Accordingly, where the property owner undertakes or proffers the undertaking of three actions—(1) payment of the tax and costs of the abatement action, (2) the filing of a bond in the full value of the property, and (3) a demonstration that he will not exhibit the particular items declared to be obscene—the trial court *must* release the closure order. Any enlargement of the foregoing undertakings required of the owner would be impermissible under the statute and, if such enlargement related to a requirement that the owner refrain from exhibiting materials *not* judicially determined to be obscene, would additionally amount to a constitutionally impermissible prior restraint on the defendant's rights under the First Amendment. We take the foregoing to be the only conclusion properly to be drawn from the *Without a Stitch* and *Huffman* cases, *supra*.

Here, the defendants argue that the trial court attempted just such an enlargement of the undertakings permitted under R. C. 3767.04 at the hearing on May 22nd, the first attempt by defendant to secure relief from the closure order. It is argued that the trial court sought to impose a restraint upon the exhibition of materials not determined to have been obscene, and refused to consider the proffer to remove the closure because it was not timely made (*e. g.*, it was made during or immediately after trial). While not entirely free from ambiguity, the record of the May 22nd hearing does not convincingly sustain defendants' arguments as to these points. More to the point, however, the

record does clearly reveal that the trial court did not err in rejecting defendants' proffer, since the owner never complied or offered to comply with at least one of the three criteria for removal of the closure, the filing of a bond in the full value of the property. Since we are unable to discover in the record any undertaking by the property owner in satisfaction of all of the requirements for the removal of a closure order under R. C. 3767.06 and 3767.04 it follows that the trial court was not required to grant relief and no error attended its refusal to do so.

If, therefore, the record in this cause did not extend beyond the proceedings of May 22nd, we would be required summarily to overrule the defendants' assignments of error addressed to the issue of prior restraint, the question never having been reached as a result of the owner's failure to bring himself within the conditions requiring a removal of the closure order.

Here, however, the Barton Company made a further application for release from the closure order on October 24th. Since R. C. 3767.06 imposes no limitation upon the time in which an owner may invoke the release provisions of R. C. 3767.04, and since such release provisions are indispensable to the constitutionality of the statutory scheme in question, we conclude that we are required to examine all portions of the record relevant to the terms of the owner's covenant to abate the nuisance.

The record of hearings commencing October 24th does indeed, as defendants contend, make clear in a way in which the earlier hearings did not, that the trial court labored under a misapprehension as to the conditions it could lawfully impose upon a removal of the closure order. It was doubtless assisted in this misapprehension by the arguments of the prosecutor, as demonstrated in the following extracts:

"Now, I read this motion filed before the court on October the eleventh, and it is entitled 'Application to Abate Nuisance.' This court should not abate a nuisance: it has already abated the nuisance. It should properly be phrased 'Application to Conform with the Requirements

of 3767.06 and Allow it to be Re-opened,' but in this application that I read—now, maybe I'm not reading right. The owner—I am reading towards about the last six or seven lines from the bottom of the body of the motion. The owner is willing to pay the costs incurred in this action and asks the court to allow bond in the premises only and that is $20,000, and the court has it as record down in the clerk's office, by virtue of the submission of the name of the prospective tenant of said premises and by representation of the land owner, it will under no circumstances rent to anyone engaged in a bookstore or motion picture business.

"Well, that is not just all that could be used there. Other different types of different nuisances, don't you see, could be used there. What he has to tell this court is, 'I am not going to permit in the future a nuisance to be conducted there, including, but not limited to, a bookstore or a motion picture theatre.' But those are the three things he is asking this court or telling this court he will do now. All of a sudden this afternoon all he wants is permission to show the premises to a prospective tenant.

"That is not what the application—if all he wants to do is ask this court for an order to show the premises to some prospective tenant, I would have no objection to that, if along with that order he agrees that he will pay the court costs, that he will post a bond, and that he will demonstrate to the court that *a* nuisance will not be continued there.

"Now, I think the only way this court can be assured that these defendants mean what they say this time is to have both of them right here, have Doctor Beiderman tell you under oath and demonstrate to you and convince you that he, Doctor Beiderman—and his corporation, I should say, of which he is the president—will not permit *a* nuisance to be conducted there in the future and have Mr. Barnett stand right here and say, 'If I'm still a tenant under a lease to Doctor Beiderman's company, *I will not permit or operate a* nuisance at that location.' '' (Emphasis added.)

To this argument of the prosecutor, the owner's attor-

ney appropriately quoted the fifth paragraph of the syllabus of *Ewing, supra,* confining the terms of the covenant to abate to only those items judicially determined to be obscene, *but then voluntarily offered,* in addition to paying costs and posting at least a partial bond, to not enter "into any rental agreement until the court knows the tenant and otherwise knows the circumstances under which this property is going to be rented." This offer by the owner was repeated at the continued hearing when the owner's attorney offered to exhibit prospective tenants to the court for its prior approval, and to open no business on the premises except for that which would be operated by the court approved tenant.

This willingness and intent to rent to "nonobjectionable" tenants was repeated by the owner's officers, and repeated again at subsequent steps of the hearing:

"Q. Are you willing to bind yourself at this time to even avoid the possibility of a nuisance taking place not to rent the premises in question to anybody in any manner engaged in the sale of books and/or motion pictures or novelties?

"A. I shall not rent it to them or any questionable tenant, in fact.

"Q. That would include even a bar, perhaps?

"A. Yes."

In view of the foregoing representations of the owner, which appear to have been voluntarily given, the following colloquy between the trial court and the owner's principal becomes more understandable:

"The Court: Wait a minute. Let's see. Doctor, you are a sophisticated citizen—and I don't mean that in any critical way. What are you talking about putting in there?

"The Witness: We will put in any tenant that wants the place. For example, the Frederick Schmidt Company told me that there were two restaurants that were interested in it. A man from West Shell has said that Baldwin Piano Company has to move and they are looking.

"The Court: Where? Down on Fourth Street?

"The Witness: Yes, that they have to move. They are

looking for a place and there's somebody on the Fifth Street side. There's a Progressive Loan and another company.

"The Court: O. K. Those are all fine and you know they are fine.

"The Witness: Those are the ones we have in mind.

"The Court: Those all are interesting and attractive tenants, but I think we want to be realistic.

"The Witness: No bookstore.

"The Court: Sir?

"The Witness: No bookstore.

"The Court: We know that strip up there, if you can call it a strip, has been, in the judgment of some responsible people, an unwholesome area there, from Eighth and Vine north for several blocks, and this court would feel some responsibility to see that there was a realistic determination that the nuisance—*another* nuisance not to go in there.

"All right. I have nothing further to say to the doctor.'' (Emphasis added.)

The substance of this exchange was again repeated toward the end of the hearings, after considerable skirmishing over the amount of costs and the type of bond to be exacted had transpired:

"The Court: Doctor Beiderman, we want to say, you have been in this community, maybe you will agree, your whole life. I don't remember what your testimony was, but you know—you are a realistic citizen and you know what is consistent with a proper place going in there and what isn't, sir, and if there [is] a prima facie showing or any showing that the prosecutor would feel to bring to the attention of this court that you were attempting to rent to a tenant in there what constituted a nuisance, sir, then there would be a—the matter would be brought to the court and you would be confronted with the forfeiture of the $20,000 bond. Now, we hope we don't get to that point. I don't want to and I am asking you not to let the situation get to that point, please.

"Mr. Brown: Let me state for Doctor Beiderman his present intention, your Honor. He wishes to be a law-

abiding citizen, as he feels all his life he has been a law-abiding citizen. He also wishes to be a citizen who avoids difficulty. For this reason, *he will not rent to any bookstore,* even Kidd's for fear that there might creep into such bookstore that which might be deemed a nuisance. *He will not rent to any person who sells motion pictures in any form whatsoever,* for fear that beyond his capacity to control there might creep in a nuisance. If it is at all economically feasible, he will not rent to a person holding a liquor license, for fear that a nuisance will be introduce[d]. He will not in any way rent to anybody engaged in personal physical services, barber, beautician, for fear a nuisance might be introduced. In other words, he is going to lean over backwards in this area.

"Mr. Ney: Just for the record, I think for the court's protection as well the state of Ohio, this court is not asking Doctor Beiderman to do anything in fear of violating the law. I think all this court is asking Doctor Beiderman to do as a reasonable, sensible man is not to permit under the statute *another nuisance to occur * * *.*" (Emphasis added.)

The consequence of the foregoing events was the journalization of an entry removing the closure of the owner's property upon the payment of the costs, the posting of bond, and a further undertaking by the owner characterized by the court in the following language:

"The Court: I don't think it is a denial of any of the return of the privileges that this court is willing to grant to Doctor Beiderman to have it [*i. e.,* the order removing the closure] read, has demonstrated to the court that it will prevent a nuisance from being re-established. That is what I would rather say in there, if you have no objection.

"Mr. Brown: It is the court's entry and the court may do as it pleases."

The use by the court of the indefinite article "a" rather than the definite article "the," with respect to the nuisance not to be re-established, reflects, of course, the resolution of apparently all of the parties that the owner was not simply to refrain from displaying the six items determined as obscene, but to refrain from creating or permitting

nuisances generally, such as ''sleazy * * * establishments.''

It seems to us inevitably to follow from what we have previously stated as our understanding of the law of this state, that the terms of the covenant to abate as a condition of release from the closure order were impermissibly broad under the Ohio statute, and that so phrased constituted a prior restraint under the First Amendment. At the same time, we are required to conclude from the record before us that the action of the trial court was, if not encouraged or invited, at least consented to by the owner, and that, therefore, the owner ought not to be allowed to assert on appeal that to which he failed to object at trial. Accordingly, we make the following disposition of this first aspect of the instant cause: to the extent that the assignments of error assert the facial unconstitutionality of R. C. 3767.01 *et seq.*, as judicially construed, they are without merit and are overruled; to the extent that the assignments of error assert the existence of an impermissible prior restraint as such statutes were applied under the facts of this case, they are similarly overruled, but solely for the reasons above set forth.

## II.

The second question of merit raised in this appeal relates to alleged error growing out of the refusal by the trial court to permit defendants to introduce evidence directed toward the various components of the *Miller* obscenity test.[5] Thus, the trial court stated:

''In final argument counsel for one of the defendants challenged the Court not to equate what might be the Court's taste for magazines with standards of others, counsel suggesting that the Court may be unaware of the shifting of values which has taken place in recent years, and

---

[5]''The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois* v. *Wisconsin, supra*, at 230, quoting *Roth* v. *United States, supra*, at 489; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.'' 413 U. S. at 24.

currently continues, concerning depiction of sexual activities. This Court takes issue with any charge of isolation from the reality of community life and standards. This Court considers it is well qualified to understand what are contemporary community standards in the forum community. Adult book store proprietors have no monopoly on the ability effectively to assess contemporary community standards in the area of sex activity descriptions. Contemporary community standards are not exclusively established by what is or is not available for sale in some book stores. To attempt to so circumscribe the concept of contemporary community standards is false and unreal. Contemporary community standards are formed by countless influences. Community standards are the rules by which people decide to live—in their families, in their homes, offices, other places of employment, houses of worship, their schools, libraries, in organizational activity, recreation places and the like."

The factual antecedent for the above comment was, inter alia, the refusal of the court to permit the introduction into evidence of exhibits offered by defendants and arguably demonstrative of contemporary community standards, or of testimony with respect thereto or with respect to "prurient appeal," or to permit such exhibits to be marked for identification, or to be proffered into the record subsequent to their rejection as evidence.

The plaintiff's position in support of said actions of the court derives from language found in *Paris Adult Theatre I* v. *Slayton* (1973), 413 U. S. 49, to the effect that the contested materials in themselves are the best evidence of obscenity. The state extends this argument to conclude therefrom that once the materials themselves are in evidence, as here, the court may properly bar any attempt by the defense to explain them in terms of the constitutional standards set down in *Miller* v. *California, supra*. We must disagree.

The relevant evidentiary ruling of *Paris Adult Theatre I* goes to the question of the sufficiency of the *plaintiff's*, or the prosecutor's case, not to what may be excluded from the defense. The court, at page 56, wrote that it was *not* "error

to fail to require 'expert' *affirmative* evidence that the materials were obscene when the materials * * * were actually * * * in evidence.'' (Emphasis added.) The distinction between what evidence may safely be omitted from a plaintiff's case, and what evidence may be barred from a defendant's case, are readily apparent. These distinctions were subsequently noted by the Court in *Kaplan* v. *California* (1973), 413 U. S. 115, 121, as follows:

''We also reject in *Paris Adult Theatre I* v. *Slaton, ante,* p. 49, *any constitutional need for 'expert' testimony on behalf of the prosecution,* or for any other ancillary evidence of obscenity, once the allegedly obscene material itself is placed in evidence. *Paris Adult Theatre I, ante,* at 56. *The defense should be free to introduce appropriate expert testimony,* see *Smith* v. *California,* 361 U. S. 147, 164-65 (1959) (Frankfurter, J., concurring), but in 'the cases in which this Court has decided obscenity questions since *Roth,* it has regarded the materials as sufficient in themselves for the determination of the question.' *Ginzburg* v. *United States,* 383 U. S. 463, 465 (1966). See *United States* v. *Groner,* 479 F. 2d 577, 579-586 (CA5 1973). On the record in this case, the prosecution's evidence was sufficient, as a matter of federal constitutional law, to support petitioner's conviction.'' (Emphasis added.)[6]

This issue, it seems to us, goes to the very heart of the adversary system, and touches squarely those fundamental concepts of judicial fairness described by Justice Frankfurter in *Smith* v. *California* (1959), 361 U. S. 147, 164-165, reinforcing: ''* * * the right of one charged with obscenity—a right implicit in the very nature of the legal concept of obscenity—to enlighten the judgment of the tribunal, be it the jury or as in this case the judge, regarding the prevailing literary and moral community standards and to do so through qualified experts.''

He stated further: ''It is immaterial whether the basis of the exclusion of such testimony is irrelevance, or the

---

[6] We note the arguable ambiguity created by the concluding clause of the second sentence of the quoted extract. We cannot conceive, however, that the court intended thereby to shrink the defendant's right to due process. See text, *infra.*

incompetence of experts to testify to such matters. The two reasons coalesce, for community standards or the psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts. Therefore, *to exclude* such expert testimony *is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process."* (Emphasis added.) Cited with approval in *Kaplan, supra.*

Accordingly, we are required to hold that it is error for a trial court to deny, or unreasonably curtail a defendant's right in an obscenity case to introduce into evidence otherwise competent and non-repetitive testimony or exhibits which directly relate to or bear upon the absence of any or all of the elements of the *Miller* obscenity test. To hold otherwise would, so it seems to us, authorize the entirely impermissible situation where a court, sitting, as here, in equity without the benefit of a fact-finding jury and not required to empanel an advisory jury, would become the sole arbiter, unassisted by and uninstructed through the testimony of competent witnesses, of those community standards which are essential to the definition of what is, or is not, prurient and patently offensive and therefore obscene, and thereby deny to the defendant in the cause the opportunity required by due process of law to present evidence favorable to his position.

The fifth assignment of error is therefore sustained, and, as a consequence, it is unnecessary to make a disposition of the sixth. The first, second and third assignments having been overruled pursuant to the discussion in Part I of this decision, and the fourth assignment being overruled herewith, the cause is remanded for proceedings not inconsistent with this decision.

*Judgment affirmed in part, reversed in part, and cause remanded.*

SHANNON, P. J., PALMER and CRAWFORD, JJ., concur.

CRAWFORD, J., retired, assigned to active duty under authority of Section 6(C), Article IV, Constitution.