The STATE ex rel. ECKSTEIN, Appellee,

v.

MIDWEST PRIDE IV et al., Appellants.

[Cite as *State ex rel. Eckstein v. Midwest Pride IV, Inc.* (1998), 128 Ohio App.3d 1.]

Court of Appeals of Ohio,
Twelfth District, Fayette County.

Nos. CA97–03–007 and CA97–04–011.

Decided April 6, 1998.

2

4

*Steven H. Eckstein,* Fayette County Prosecuting Attorney, and *James B. Grandey,* Assistant Prosecuting Attorney, for appellee.

*Berkman, Gordon, Murray & Devan, J. Michael Murray* and *Jeremy A. Rosenbaum,* for appellants.

WALSH, Judge.

Appellants, Geri Riley, as executor for the estate of Frank E. Findo, and Michele Moran ("owners"), are owners of real property in Washington Court House, Fayette County, Ohio in which defendant-appellant, Midwest Pride IV, Inc. ("Midwest"), operates an adult video store called the Lion's Den Adult Bookstore ("Lion's Den"). In June 1994, the Fayette County Prosecutor, Steven H. Eckstein, allegedly sent Midwest a letter in which, according to Midwest, he "threatened to pursue criminal and/or civil proceedings against [Midwest] for pandering obscenity if [Midwest] continued to rent certain unidentified videotapes containing any sexual depictions * * *." [1]

On December 14, 1995, an investigator from the Fayette County Sheriff's Office purchased three videotapes from the Lion's Den. On December 20, 1995, prosecutor Eckstein filed a civil nuisance action, asserting that the three video-tapes were obscene and that their sale constituted a "repeated violation" of R.C. 2907.32, which prohibits the pandering of obscenities.[2] The prosecutor sought to have the tapes declared obscene, to enjoin the Lion's Den from showing, renting, or selling those tapes or any similar tapes, and to permanently close the Lion's Den on the grounds that it constituted a nuisance. Midwest moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The

---

1. The letter is not in the record. Both Midwest and the state acknowledge that it was received by Midwest.

2. Midwest was convicted on September 15, 1995 of pandering obscenity based on the August 1993 sale of certain videotapes.

Fayette County Court of Common Pleas denied the motion to dismiss. In July 1996, Midwest answered the complaint and filed a counterclaim pursuant to Sections 1983 and 1988, Title 42, U.S. Code and R.C. Chapter 2721. Midwest also moved to seat an advisory jury. On the state's motion, Midwest's counterclaim was dismissed. Midwest's motion for an advisory jury was also denied. In accordance with the nuisance abatement statute, the owners applied for release from an anticipated closure order.

A trial was held before the court on February 11, 1997. A separate hearing on the application for release from closure took place on March 6, 1997. In the judgment entry, the trial judge found that the three tapes were obscene under Ohio law, that Midwest had been convicted previously of pandering obscenity under R.C. 2907.32 at the same location, and that together these actions were "repeated violations" which constitute a nuisance subject to abatement. The judge ordered Midwest to abate the nuisance, perpetually enjoined Midwest from disseminating the three tapes, ordered the premises closed for one year, taxed Midwest $300, and denied the owners' request for release from the closure order.

The owners appealed the portion of the trial court's judgment entry denying their application for release from closure and closing the premises for one year. The owners also moved to stay closure of the premises pending the outcome of this appeal. This court granted the motion to stay on March 13, 1997. Midwest also filed a notice of appeal. The two appeals were consolidated in April 1997. Together, appellants present six assignments of error for review.

## I. The Application for Release from Closure

In their first and second assignments of error, appellants complain that the trial court erred in denying their application for release from the closure order. Appellants contend that the trial court denied their application on improper grounds, *i.e.*, because the court was "not satisfied with the good faith of the owners." Appellants also assert that the closure order imposes an unconstitutional prior restraint in violation of the First Amendment to the United States Constitution.

Under Ohio's nuisance abatement scheme, if the existence of a nuisance is admitted or established in a civil action, the trial court must enter a judgment that perpetually enjoins the defendant from maintaining the nuisance and that includes an order of abatement. R.C. 3767.05(D); 3767.06(A).[3] If no closing order has been issued previously, the abatement order must include, *inter alia*, a

---

3. Premises used for repeated violations of Ohio's criminal obscenity statutes, including R.C. 2907.32(A)(2), which prohibits selling or renting obscene material, constitute a nuisance subject to abatement. R.C. 2907.37(B).

directive closing the "place where the nuisance is found to exist" for a period of one year. R.C. 3767.06(A). Under R.C. 3767.04, the owner of real property may obtain a release from the closure order in the following manner:

"[I]f all costs incurred are paid and if the owner of the real property files a bond with sureties approved by the clerk, in the full value of the real property as ascertained by the court * * * and conditioned that the owner of the real property immediately will abate the nuisance and prevent it from being established or kept until the decision of the court or judge is rendered on the complaint for the permanent injunction, the court or judge * * * *if satisfied of the good faith of the owner of the real property* * * * shall deliver the real * * * property * * * to the respective owners and discharge or refrain from issuing * * * any order closing the real property * * *." (Emphasis added.) R.C. 3767.04(C).

The Ohio Supreme Court has determined that R.C. 3767.01 *et seq.* sets forth a constitutionally permissible means of controlling obscenity. *State ex rel. Ewing v. Without a Stitch* (1974), 37 Ohio St.2d 95, 66 O.O.2d 223, 307 N.E.2d 911, paragraph three of the syllabus, dismissed *sub nom., Art Theater Guild, Inc. v. Ewing* (1975), 421 U.S. 923, 95 S.Ct. 1649, 44 L.Ed.2d 82. The release provisions of R.C. 3767.04, which ameliorate the "harsh penalty" of the closure order, are, however, critical to that determination. *Id.* at 105, 66 O.O.2d at 229, 307 N.E.2d at 917–918. In *Without a Stitch,* which involved a civil abatement action against the exhibiting of an obscene film, the court emphasized the importance of the release provisions in cases involving expressive material. In that context, the court held that the release of a closure order was mandatory—and thus outside the trial court's discretion—once the owner of the premises "pays the cost of the abatement action, files a bond in the full value of the property, and *demonstrates to the court*" that he will not exhibit the obscene material. (Emphasis added.) *Id.,* paragraph five of the syllabus. In an obscenity/nuisance context, the nuisance is the material determined to be obscene. See *id.* at 105, 66 O.O.2d at 229, 307 N.E.2d at 918 ("The release provisions do not * * * require the owner to show that no film to be exhibited during the one-year period will be obscene. Such a requirement would not only be impossible, as a practical matter, but also would be an unconstitutional prior restraint on an activity generally protected by the First Amendment.").

Ohio's First District Court of Appeals considered the nuisance abatement statute in the context of the sale of obscene magazines and films in *State ex rel. Leis v. William S. Barton Co., Inc.* (1975), 45 Ohio App.2d 249, 74 O.O.2d 387, 344 N.E.2d 342, and again emphasized the critical role of the release provisions in cases where a prior restraint might otherwise result ("but for their release from the closure provision, the Ohio padlock statutes would impose an unconstitutional

prior restraint * * * "). *Id.* at 253, 74 O.O.2d at 390, 344 N.E.2d at 346. *Barton* provides further clarification of the release provisions where the First Amendment is implicated:

"[W]here the property owner *undertakes or proffers the undertaking* of three actions—(1) payment of the tax and costs of the abatement action, (2) the filing of a bond in the full value of the property, and (3) *a demonstration that he will not exhibit the particular items declared to be obscene*—the trial court *must release* the closure order." (Emphasis added.) *Id.* at 254, 74 O.O.2d at 391, 344 N.E.2d at 346.

The court specified that "any enlargement of the foregoing undertakings required of the owner would be impermissible under the statute and, if such enlargement related to a requirement that the owner refrain from exhibiting materials *not* judicially determined to be obscene, would additionally amount to a constitutionally impermissible prior restraint on the defendant's rights under the First Amendment." *Id.* (Emphasis *sic.*)

▆▆ To summarize, this court's understanding of the combined effect of *Without a Stitch* and *Barton* is that in this particular context, *i.e.,* a civil nuisance abatement action involving material presumptively protected by the First Amendment, a trial court may not deny an application for release from a closure order once the three conditions set forth in *Without a Stitch* and *Barton* have been met.[4] This is so notwithstanding the statutory language of R.C. 3767.04(C) vesting a trial court in an ordinary nuisance action with the discretion to consider whether an applicant is acting in "good faith."[5] In this context, common law supersedes the statute. See *Vance v. Universal Amusement Co., Inc.* (1980), 445 U.S. 308, 315–316, 100 S.Ct. 1156, 1161, 63 L.Ed.2d 413, 420, rehearing denied (1988), 446 U.S. 947, 100 S.Ct. 2177, 64 L.Ed.2d 804 ("[t]he regulation of a communicative activity such as the exhibition of motion pictures must adhere to more narrowly drawn procedures than is necessary for the abatement of an ordinary nuisance * * * ").

▆▆ In reaching this conclusion, we rely also on First Amendment jurisprudence disfavoring prior restraints. Motion pictures, like other types of speech,

---

4. Since *Barton,* at least one other court in Ohio has rejected a trial court's use of the statutory "good faith" standard to deny an application for release in a case involving the closure of an adult bookstore. See *State v. Lions Den Adult Book Store* (June 15, 1992), Licking App. No. 92–CA–16, unreported, 1992 WL 155249 (owner's testimony that he would abate the nuisance satisfied the third or "demonstration" prong of the "tripartite test of the statute" as set forth in *Without a Stitch* and compelled trial court to release the premises from closure order).

5. R.C. 3767.04 was amended June 1, 1992. This statute in its prior form became effective on October 1, 1953. Both versions contain similar provisions concerning the trial court being satisfied that the applicant is acting in good faith.

are entitled to protection from prior restraint. *Freedman v. Maryland* (1965), 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649; *Joseph Burstyn, Inc. v. Wilson* (1952), 343 U.S. 495, 501–502, 72 S.Ct. 777, 780, 96 L.Ed. 1098, 1105–1106. A prior restraint exists where an "injunction operates, not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature 'of any kind' * * *." *Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 418, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1, 5. Not every prior restraint is unconstitutional, *Southeastern Promotions, Ltd. v. Conrad* (1975), 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448, 458–459; yet "[a]ny system of prior restraints of expression * * * bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan* (1963), 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593. Indeed, "the burden of supporting an injunction against a future exhibition is even heavier than the burden of justifying the imposition of a criminal sanction for a past communication." *Vance*, 445 U.S. at 315–316, 100 S.Ct. at 1161, 63 L.Ed.2d at 420. See, also, *Southeastern*, 420 U.S. at 558–559, 95 S.Ct. at 1246, 43 L.Ed.2d at 459 ("presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties"). The rationale behind this distinction is the "theory deeply etched in our law * * * [that] a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Id.*, 420 U.S. at 559, 95 S.Ct. at 1246, 43 L.Ed.2d at 459.

■■ This presumption against prior restraints must be balanced, however, against the state's legitimate interest in controlling the exhibition of obscenity.[6] *Paris Adult Theatre I v. Slaton* (1973), 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446, rehearing denied (1973), 414 U.S. 881, 94 S.Ct. 27, 38 L.Ed.2d 128. It is permissible to restrain future exhibition of *specific* material that has been determined to be obscene. *Ewing.* See, also, *Paris*, 413 U.S. at 54–55, 93 S.Ct. at 2633–34, 37 L.Ed.2d at 454–456; *Grove Press, Inc. v. Flask* (N.D.Ohio, 1970), 326 F.Supp. 574, vacated and remanded on other grounds (1973), 413 U.S. 902, 93 S.Ct. 3026, 37 L.Ed.2d 1013; *People ex rel. Joseph P. Busch v. Projection Room Theater* (1976), 17 Cal.3d 42, 57, 130 Cal.Rptr. 328, 337, 550 P.2d 600, 609, certiorari denied *sub nom., Van de Kamp v. Projection Room Theater* (1976), 429 U.S. 922, 97 S.Ct. 320, 50 L.Ed.2d 289. On the other hand, closing an entire

---

6. A prior restraint may be constitutionally permissible if it occurs under the protection of certain procedural safeguards. These include: (1) the burden of proving that material is unprotected must rest on the state; (2) any restraint imposed prior to a final judicial determination on the merits must be limited to "the shortest fixed period" possible and be only for the purpose of preserving the status quo; and, (3) a prompt judicial determination must occur. *Southeastern*, 420 U.S. at 560, 95 S.Ct. at 1247, 43 L.Ed.2d at 460; *Freedman*, 380 U.S. at 58–60, 85 S.Ct. at 739, 13 L.Ed.2d at 654–656.

bookstore where individual items violate obscenity laws has been viewed by numerous courts as an unconstitutional prior restraint. *Paducah v. Investment Entertainment, Inc.* (C.A.6, 1986), 791 F.2d 463, 467, 468; *Cornflower Entertainment, Inc. v. Salt Lake City Corp.* (D.Utah 1980), 485 F.Supp. 777; *Busch; Sanders v. State* (1974), 231 Ga. 608, 613, 203 S.E.2d 153, 157 ("One obscene book on the premises of a book store does not make an entire store obscene. The injunction closing this store and padlocking it as a public nuisance necessarily halted the future sale and distribution of other printed material which may not be obscene, thereby precluding * * * procedural safeguards and creating an unconstitutional restraint * * *[.]").

■ With the foregoing in mind, we now turn to the question of whether the trial court erred in denying the owners' application for release from the closure order. The owners filed a sworn proffer with their release application in which they stated:

"5. * * * affiants hereby proffer * * * (c) to prevent the re-occurrence of the 'nuisance,' as shown by the evidence and found by this Court;

"6. * * * they represent that videotapes titled 'Hard Pump,' 'Shanna McCullough (non-stop)', 'She–Male Fuckathon,' 'Carolyn Monroe,' and 'Climatic Scene Number 28' will not be stocked, sold, rented, disseminated, exhibited or otherwise transferred at the premises during the term of this Court's closure order. They further represent that they have so instructed Midwest Pride IV, Inc.; and, Midwest Pride IV, Inc. has confirmed that said videotapes have not been disseminated at the premises for a considerable length of time, that no copies of said videotapes are contained in the inventory of the items presently available at the premises and that said videotapes will not be re-stocked, sold, rented, disseminated, exhibited or otherwise transferred at the premises in the future."

In addition, at the hearing on the release from closure application, premises owner Moran testified:

"*ROSENBAUM:* [7] * * * and those tapes that have been declared to be obscene and you have insisted and you have reached an agreement with the operator of the store that they would never be stocked or sold at those premises again is that correct.

"*MORAN:* That's right.

" * * *

---

7. Rosenbaum is Midwest's attorney.

"*ROSENBAUM:* \* \* \* did you get assurances from Michael Moran as to uh that the situation would be monitored and he would make sure that these tapes were never sold on those premises again?

"*MORAN:* Yes I did.

" \* \* \*

"*ROSENBAUM:* Do you want to appear before this court again in [*sic*] and try to explain why these particular tapes were sold at these premises after you have said that they would never be sold there again?

"*MORAN:* No I certainly don't.

"*ROSENBAUM:* Have any interest in a $100,000 dollars [*sic*] being forfeited um, in order to sell those particular tapes at this location again?

"*MORAN:* No not at all." (Footnote added.)

On cross-examination, Moran testified that she was not on the premises every day, but that she had been "told by the people who work there that those [obscene videotapes] will not be sold." Moran stated that her husband, a fifty percent shareholder of Midwest Pride, had assured her that the tapes would not be sold.

Geri Riley, the other owner of the premises, did not testify. Counsel stipulated that her testimony would be the same as Michele Moran's.

Michael Moran, Michele Moran's husband, testified that he was a stockholder in Midwest. He assured the court that Midwest would comply with the injunction and refrain from stocking, possessing, or selling the tapes, and that anything that had been judged to be obscene was not allowed in the store. Moran also stated that Leslie Walp, the manager of the store, is responsible for the day-to-day operation of the store and has been instructed to make sure that those particular tapes are not stocked in the store.

These oral and written statements made under oath constitute the "demonstration" required by *Without a Stitch* and *Barton.* In light of the foregoing discussion, we find that the trial court misapplied the statutory "good faith" standard, which, in this context, has been superseded by the requirement that applicants merely make a "demonstration" that the nuisance will be abated.[8] *Without a Stitch; Barton.*

By relying on the statutory standard rather than the common law, the trial court has improperly extended the reach of the closure order to material that is presumptively protected by the First Amendment. The trial court's order

---

8. Of course, the owners are also required to pay the cost of the abatement action and post a bond in the full value of the property.

suppresses for one year material that has not been determined to be obscene and is not protected by procedural safeguards. See *Freedman.* The trial court's decision also forecloses the owners from the benefit of the release provisions which have been determined to be not only critical to the constitutionality of the nuisance abatement scheme where First Amendment protected materials are concerned, but indeed mandatory once certain conditions have been met. In short, the trial court's order imposes a prior restraint that would prevent the future distribution of all movies without regard to their content. See *Keefe,* 402 U.S. at 418, 91 S.Ct. at 1577, 29 L.Ed.2d at 4–5. Accordingly, we sustain the first and second assignments of error. The order of the trial court denying the application for release from the closure order is reversed and appellants' application for release is granted.

We note as a practical matter there is little risk to this result. To obtain a release, owners must also post a bond for the entire value of their premises. If the owners fail to live up to their promise to refrain from trading in obscene material, they stand to forfeit that amount.

### II. Meaning of "Repeated Violations"

 In its third assignment of error, Midwest complains that the trial court erred by failing to dismiss the complaint because the state neither alleged nor proved that the premises were used for "repeated violations" of Ohio's pandering obscenity laws. Midwest contends that the phrase "repeated violations" means: (1) three or more violations, (2) less than two years apart. Under this definition, Midwest's 1995 conviction for an August 1993 violation and the present action arising out of a December 1995 sale of three obscene tapes do not constitute "repeated violations."

Several courts have considered the word "repeated" in a variety of contexts and concluded that it means more than once. See *Champagne v. Gintick* (D.Conn.1994), 871 F.Supp. 1527, 1534 ("[t]he word 'repeatedly' requires a finding that the defendant followed the victim * * * *'on more than one occasion'* "); *Phillips v. Dept. of Agriculture* (C.A.9, 1991), 923 F.2d 862 ("[c]ourts have interpreted the word *'repeated'* strictly. * * * [I]t simply *means more than once* "); *Brooks v. McWhirter Grading Co., Inc.* (1981), 303 N.C. 573, 588, 281 S.E.2d 24, 31 (a *second,* similar OSHA *violation* is a repeated violation); *State v. Larimer* (1976), 191 Colo. 201, 205, 551 P.2d 716, 720 (*"[r]epeatedly* is a word of such common understanding that its meaning is not vague. It simply *means* * * * more than one time*"); *Lomax v. D.C.* (D.C.App.1965), 211 A.2d 772, 774 (repeated sexual misconduct means *"on more than one occasion* ").

Midwest relies on several dictionary definitions to advance its position. These are helpful, but not conclusive. As Midwest points out in its brief, "repeated" has

been defined as "renewed or recurring *again and again*" (more than twice) as well as "said, done, or presented *again*" (twice or more). See Webster's Third International Dictionary (1993) 1924.

For legal precedent, Midwest cites *Bethlehem Steel Corp. v. OSHRC* (C.A.3, 1976), 540 F.2d 157. In that case, the Third Circuit interpreted the word "repeatedly" to mean "at least twice." *Id.* at 162, fn. 11 ("we do not believe that only two violations can ever form the basis of a 'repeatedly' violation within the meaning of [OSHA]"). After due consideration, we decline to follow the Third Circuit's interpretation. In doing so, we observe that the reasoning of *Bethlehem Steel* has been rejected by the Fifth Circuit, see *Bunge Corp. v. Secretary of Labor* (C.A.5, 1981), 638 F.2d 831, 837; the Ninth Circuit, see *Todd Shipyards Corp. v. Secretary of Labor* (C.A.9, 1978), 586 F.2d 683, at 685–687; and the Fourth Circuit, see *George Hyman Constr. Co. v. OSHRC* (C.A.4, 1978), 582 F.2d 834. We find instead that two violations of Ohio's pandering laws are sufficient to allege a claim under R.C. 2907.37. We also find that the two violations at issue here—occurring as they do in August 1993 and December 1995—occurred close enough in time to constitute repeated violations. Midwest offers no apposite legal authority in support of its proposition that "repeated violations" must occur no more than two years apart, nor have we found any. The third assignment of error is overruled.

*III. Midwest's Section 1983, Title 42, U.S. Code Counterclaim*

In the fourth assignment of error, Midwest complains that the trial court erred by dismissing its counterclaim brought under Section 1983, Title 42, U.S. Code and R.C. Chapter 2721. Midwest raises several issues under this assignment of error.

First, Midwest argues that the trial court erred by applying the wrong statute of limitations to the Section 1983 claim. Section 1983 does not contain a statute of limitations. *Wilson v. Garcia* (1985), 471 U.S. 261, 266, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254, 260. The proper statute of limitations for Section 1983 claims is the personal injury statute of limitations in the state where the Section 1983 claim arises. *Id.* at 276, 105 S.Ct. at 1947, 85 L.Ed.2d at 266–267. If a state has multiple statutes of limitations for personal injury actions, the residual or general personal injury statute of limitations applies. *Owens v. Okure* (1989), 488 U.S. 235, 236, 109 S.Ct. 573, 574, 102 L.Ed.2d 594, 597.

The Sixth Circuit Court of Appeals has consistently held that the appropriate statute of limitations for Section 1983 actions is the two-year period set forth in R.C. 2305.10, Ohio's statute of limitations for bodily injury and injury to personal property. *Browning v. Pendleton* (C.A.6, 1989), 869 F.2d 989. See,

also, *Kuhnle Brothers, Inc. v. Geauga Cty.* (C.A.6, 1997), 103 F.3d 516; *Collyer v. Darling* (C.A.6, 1996), 98 F.3d 211, certiorari denied (1997), 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199; *LRL Properties v. Portage Metro Hous. Auth.* (C.A.6, 1995), 55 F.3d 1097. Several Ohio courts have reached the same result as the Sixth Circuit. See *Gaston v. Toledo* (1995), 106 Ohio App.3d 66, 78, 665 N.E.2d 264, 272; *Francis v. Cleveland* (1992), 78 Ohio App.3d 593, 598, 605 N.E.2d 966, 969; *Harman v. Gessner* (Sept. 9, 1997), Mahoning App. No. 96 C.A. 123, unreported, at 9, 1997 WL 568009; *Freshour v. Carroll* (Aug. 17, 1989), Pickaway App. No. 88 CA 34, unreported, 1989 WL 98477. Other Ohio courts, however, take the position that the appropriate limitations period is the four-year statute of limitations set forth in R.C. 2305.09(D). See *Bojac Corp. v. Kutevac* (1990), 64 Ohio App.3d 368, 370, 581 N.E.2d 625, 626–627; *Weethee v. Boso* (1989), 64 Ohio App.3d 532, 534–535, 582 N.E.2d 19, 20–21. But, see, *Herdman v. Capretta* (Dec. 17, 1996), Franklin App. No. 96APE05–864, unreported, 1996 WL 729858 (apparently, though not expressly, overruling *Weethee* insofar as it asserts that the limitations period for Section 1983 actions is two years). See, also, *Martin v. Adult Parole Auth.* (Mar. 4, 1994), Marion App. No. 9–93–45, unreported, at 9, 1994 WL 66662. Appellant urges this court to follow *Bojac* and *Weethee* and apply the four-year statute of limitations. We decline to do so.

*Okure* requires courts considering Section 1983 actions to apply the residual or general statute for *personal injury* actions. *Okure* at 249–250, 109 S.Ct. at 581, 102 L.Ed.2d at 605–606. R.C. 2305.09(D) contains a residual statute of limitations; however, it is apparent to this court that R.C. 2305.10 contains the general statute of limitations for personal injury actions. Therefore, we find that the appropriate limitations period to be applied in a Section 1983 action is the two-year period set forth in R.C. 2305.10.

Midwest argues in the alternative that even if the two-year statute of limitations period applies to its Section 1983 action, its claim was brought within that limitations period. Federal law determines the date on which a statute of limitations begins to run in a Section 1983 action. *Sevier v. Turner* (C.A.6, 1984), 742 F.2d 262, 272. Generally, the "statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* at 273. In a Section 1983 action, the injury is the constitutional wrong that a plaintiff, or, in this case, a counterclaim plaintiff, alleges. See *A.M.R. Ent. v. Phoenix* (Mar. 25, 1997), D.Ariz. No. CIV–94–2007–PHX–ROS(BGS), unreported, 1997 WL 150104, citing, *inter alia, Shannon v. Recording Indus. Assn. of Am.* (S.D.Ohio 1987), 661 F.Supp. 205, 210. Midwest's counterclaim, filed in July 1996, contains two allegations of federal constitutional violations. First, Midwest claims that prosecutor Eckstein's June 1994 letter "attempts to impose a prior restraint on expression." Midwest also claims that

the state's complaint, filed in December 1995, wrongly alleges that the three videotapes are obscene.

Midwest appears to suggest on appeal that the filing of the state's complaint was the "triggering event" for the Section 1983 statute of limitations. In its counterclaim, however, Midwest clearly identifies prosecutor Eckstein's June 1994 letter as the initial constitutional injury. We agree that the Section 1983 limitations period was triggered by the prosecutor's letter. Midwest also contends that its counterclaim alleges a "continuing violation" that began in June 1994. Midwest's counterclaim does not support this contention; it contains no such allegation. Nor does Midwest elaborate upon this theory in its brief on appeal.

The continuing violation theory cited by Midwest originated in actions under Title VII. See *Velazquez v. Chardon* (C.A.1, 1984), 736 F.2d 831, 833. It has been applied to Section 1983 claims, but is typically used in employment discrimination claims. Although the theory can be used in contexts other than Title VII or employment discrimination, courts have been "wary" to do so. *McGregor v. Louisiana State Univ. Bd. of Supervisors* (C.A.5, 1993), 3 F.3d 850, 866, fn. 27, certiorari denied (1996), 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415. To show a continuing violation, a plaintiff must demonstrate some evidence of a present discriminatory activity or a "longstanding and demonstrable policy of discrimination." (Citation omitted.) See *Dixon v. Anderson* (C.A.6, 1991), 928 F.2d 212, 216–217. A continuing *effect* from discrete discriminatory acts does not constitute a continuing violation. *Id.* at 216; *A.M.R.*, citing *McDougal v. Imperial Cty.* (C.A.9, 1991), 942 F.2d 668, 674–675; *Ward v. Caulk* (C.A.9, 1981), 650 F.2d 1144, 1147. See, also, *McGregor* at 867, citing *United Air Lines, Inc. v. Evans* (1977), 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571, 578–579 (single violation followed by continuing consequences is not a continuing violation; "only *continuous unlawful* acts can form the basis of a continuous violation"). (Emphasis *sic.*)

In this case, all parties agree that Midwest was alerted to the alleged injury in June 1994 when it received prosecutor Eckstein's letter. This act triggered the limitations period. The continuing effects of that act, if any, do not serve as later triggering events. See *Dixon* at 216. Accordingly, we find that the trial court did not abuse its discretion in dismissing Midwest's counterclaim filed under Section 1983. In light of this determination, the question of whether Midwest was entitled to a jury trial on its Section 1983 claim is rendered moot.

Finally under this assignment of error, Midwest contends that the trial court erred in dismissing its request for a declaratory judgment that the tapes at issue were not obscene. We considered a similar claim in *State ex rel. Eckstein*

*v. Video Express* (Apr. 28, 1997), 119 Ohio App.3d 261, 695 N.E.2d 38, and concluded that an action for declaratory judgment was inappropriate where it would be used to bypass proceedings that were pending before the trial court. *Video Express* at 268, 695 N.E.2d at 43, citing *State ex rel. Albright v. Delaware Cty. Court of Common Pleas* (1991), 60 Ohio St.3d 40, 42, 572 N.E.2d 1387, 1388–1389. Midwest invites us to reconsider our analysis. We decline to do so. Instead, we find that (1) the trial court's reliance on R.C. 2907.36(C) as a basis for dismissing Midwest's counterclaim was misplaced, but (2) the trial court did not abuse its discretion in dismissing Midwest's request for a declaratory judgment. See *Video Express* at 268, 695 N.E.2d at 43. The fourth assignment of error is overruled.

## IV. Proof of Prior Convictions in a Civil Nuisance Action

In the fifth assignment of error, Midwest contends that the trial court erred in finding that it repeatedly violated Ohio's law against pandering obscenity because the state did not offer proof of any prior convictions for pandering. Appellants acknowledge that this issue is substantially the same as a claim raised unsuccessfully by the defendant-video store owner in *Video Express* at 271–272, 695 N.E.2d at 45 and claim to raise the issue only in order to preserve it for review by the Supreme Court of Ohio. In *Video Express,* this court concluded that the state may establish repeated violations of Ohio's pandering statute during a civil abatement action without providing the same procedural safeguards available to a criminal defendant charged with violating the underlying statute. *Id.* Our position on this issue has not changed. The fifth assignment of error is overruled.

## V. Midwest's Request for an Advisory Jury

Finally, in the sixth assignment of error, appellants claim that the trial court erred in denying their request for an advisory jury. The trial court's decision to seat an advisory jury is discretionary. Civ.R. 39(C); *Video Express* at 272, 695 N.E.2d at 45–46. Here, we see no indication that the trial court abused its discretion. Appellants' sixth assignment of error is overruled.

The judgment of the trial court is affirmed in part and reversed in part.

*Judgment affirmed in part*
*and reversed in part.*

POWELL, P.J., concurs in part and dissents in part.

KOEHLER, J., concurs in part and dissents in part.

POWELL, Presiding Judge, concurring in part and dissenting in part.

I concur with the majority in all respects except for one point. That point is with respect to the application for a release from the closure order. As noted in the majority opinion, the Ohio Supreme Court has held that a release from the closure order is mandatory but only if the owner of the premises "pays the cost of the abatement action, files a bond in the full value of the property, and *demonstrates to the court*" that he will not exhibit the obscene material. (Emphasis added.) *State ex rel. Ewing v. Without a Stitch* (1974), 37 Ohio St.2d 95, 66 O.O.2d 223, 307 N.E.2d 911, at paragraph five of the syllabus. The majority opinion finds that a trial court must grant a release from the closure order once the three conditions are met regardless of whether the trial court is satisfied with the "good faith" of the owner as required by R.C. 3767.04(C). However, I do not believe that the third condition set forth in *Without a Stitch* can be met unless the trial court is satisfied with the "good faith" of the owner.

In *Without a Stitch*, the Ohio Supreme Court did not specifically define "demonstrate" or address the "good faith" discretion contained in R.C. 3767.04(C). Black's Law Dictionary (5 Ed. 1979) 389, defines "demonstrate," in relevant part, as "to show or prove value or merits by operation, reasoning, or evidence." Thus, if a trial court is not satisfied with the "good faith" of the owner, it follows that the owner failed to "show" or "prove" that he will not exhibit the obscene material, and a trial court has the discretion to deny a release from the closure order.

If the Ohio Supreme Court intended to remove the "good faith" discretion contained in R.C. 3767.04(C), an owner would only have been required to "state" that he will not exhibit the obscene materials. However, by requiring an owner to "demonstrate to the court" that he will not exhibit the obscene material, the Ohio Supreme Court preserved the "good faith" discretion that the legislature provided to a trial court in R.C. 3767.04(C). The Supreme Court certainly did not hold that such a determination was "outside the trial court's discretion." Finally, it should be noted that even though R.C. 3767.04 was amended on June 1, 1992, the "good faith" discretion granted to a trial court was not removed by the legislature. I therefore cannot concur in taking that discretion away. Since the trial court was not satisfied with the owner's "good faith" in the present case, I would find that Midwest failed "to demonstrate to the court" that it will not exhibit the obscene materials and the release from closure was properly denied.

For the foregoing reasons, I would affirm the trial court on all assignments of error.

KOEHLER, Judge, concurring in part and dissenting in part.

While I concur in the reversal of this cause, I would follow the Tenth District's decision of Judges Reilly, Whiteside, and Young in *Weethee v. Boso* (1989), 64

Ohio App.3d 532, 582 N.E.2d 19, and apply R.C. 2305.09(D), the four-year statute of limitations in Section 1983 actions.