*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

REGIS F. LUTZ; MARION L. LUTZ; LEONARD
YOCHMAN; JOSEPH L. YOCHMAN; C.Y.V.,
LLC,

　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

CHESAPEAKE APPALACHIA, L.L.C.;
COLUMBIA ENERGY GROUP; NISOURCE, INC.,
　　　　　　*Defendants-Appellees.*

Nos. 10-4538/11-3034

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 09-02256—Sara E. Lioi, District Judge.

Argued: March 7, 2012

Decided and Filed:  May 29, 2013

Before:  GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Robert C. Sanders, LAW OFFICE OF ROBERT C. SANDERS, Upper Marlboro, Maryland, for Appellants.  Yvette Harmon, McGUIRE WOODS LLP, New York, New York, for Appellees.  **ON BRIEF:** Robert C. Sanders, LAW OFFICE OF ROBERT C. SANDERS, Upper Marlboro, Maryland, James A. Lowe, LOWE EKLUND WAKEFIELD & MULVIHILL, Cleveland, Ohio, for Appellants.  Yvette Harmon, Philip Goldstein, McGUIRE WOODS LLP, New York, New York, Jonathan Blank, McGUIRE WOODS LLP, Charlottesville, Virginia, for Appellees.

_____

## OPINION

_____

GRIFFIN, Circuit Judge.  Plaintiffs-appellants are the owners and lessors of royalty rights to natural gas produced in Trumbull and Mahoning Counties in Ohio.  In September 2009, plaintiffs filed this putative class-action lawsuit, alleging that

defendants-appellees—three interrelated energy companies[1] that entered into oil and gas leases with plaintiffs—deliberately and fraudulently underpaid gas royalties over a time period spanning more than a decade.  Plaintiffs asserted breach of contract and five additional tort and quasi-contract claims and sought compensatory and punitive damages.

The district court dismissed plaintiffs' suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.  Plaintiffs now appeal the adverse judgment with respect to their breach of contract claim and the district court's order denying their motion to alter or amend the judgment or, in the alternative, for relief from judgment under Fed. R. Civ. P. 59(e) and 60, respectively.  For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Plaintiffs are the lessors of interests in natural gas estates in tracts of land located in Ohio.  In their class-action complaint,[2] plaintiffs alleged that in 1985, Columbia Natural Resources, Inc. ("CNR") and its corporate successors, defendants herein, began producing natural gas in several states in the Appalachian Basin.  CNR entered into individual oil and gas leases with the owners of mineral rights in these states, including the named plaintiffs and members of the proposed plaintiff class.  The leases typically required CNR to pay the lessor a royalty equal to 1/8th of the value of the gas produced each month.  The monthly royalty was computed by multiplying the volumes produced by the market price of gas at the time of production and dividing that product by eight.

---

[1] In 1985, defendant Columbia Energy Group ("CEG") formed Columbia Natural Resources, Inc. ("CNR") for the purpose of producing natural gas in several states, including Ohio.  CNR entered into oil and gas leases with the owners of mineral rights, including the leases at issue in the present case.  In 2000, defendant NiSource, Inc., a Delaware corporation, engaged in the distribution of electricity and natural gas, acquired CEG and CNR, and then in 2003 sold CNR to Triana Energy Holdings, LLC.  Triana, in turn, sold CNR in 2005 to defendant Chesapeake Appalachia, LLC ("Chesapeake").  By taking ownership of CNR, Chesapeake became the successor lessee on the former CNR natural gas leases, including plaintiffs' leases.

[2] The district court held in abeyance the issue of class certification pending the resolution of the motion to dismiss.

Plaintiffs alleged that "[b]eginning in at least 1993," CNR began to deliberately and fraudulently underpay the full gas royalty due its natural gas lessors, by "(1) deducting post-production costs from the royalty payments, (2) calculating the monthly royalty payments using a price that was less than the market price of the gas at the time of production, and (3) calculating the monthly royalty payments using volumes that were less than the volumes actually produced." To conceal the improper deductions, CNR allegedly falsified the monthly accounting statements on the check stubs attached to the royalty checks. CNR also purportedly used other methods to defraud the lessors, such as reducing the price of gas (the "rate") used in the royalty formula by using the price it charged affiliate companies, who would then resell the gas for a profit at market prices.

Plaintiffs further alleged that, in addition to the improprieties described above, CNR and its successors defrauded lessors of the full royalty payments due them during a six-year period from 2000 to 2006, using yet another deceptive calculation method. In 1999 and 2000, CNR entered into two "forward sales" of gas with an off-shore entity called Mahonia II, pursuant to which CNR agreed to sell over ninety percent of all gas it produced to Mahonia II for a prospective six-year period in exchange for an up-front cash payment at a fixed price per dekatherm. In calculating the royalty payments during this period, CNR allegedly used the low, fixed gas price of under $3 a dekatherm set forth in the Mahonia II contracts, not the much higher market prices of as much as $16 a dekatherm, as required by the lease agreements. Plaintiffs averred that when Chesapeake became the lessee on the former CNR leases in November 2005, it continued the fraudulent practices of its corporate predecessor "until at least January of 2007, and perhaps to the present."

Plaintiffs' complaint asserted state-law claims for: (1) breach of contract; (2) common law fraud; (3) conversion; (4) unjust enrichment; (5) civil conspiracy and joint venture; and (6) indemnification and assumption of liability. Plaintiffs also sought punitive damages. Defendants moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiffs' breach of

contract claims were time-barred under Ohio law and the remaining counts were not independently actionable because they arose solely out of contractual duties. Plaintiffs then filed a first amended complaint and corrected first amended complaint without seeking leave to amend. Defendants moved to strike the amended complaints, and plaintiffs responded with a motion for leave to file their corrected first amended complaint.

On June 18, 2010, following oral argument and supplemental briefing, the district court issued a memorandum opinion and order granting defendants' motions and denying plaintiffs' motion. (*See also Lutz v. Chesapeake Appalachia, LLC*, No. 4:09CV2256, 2010 WL 2541669 (N.D. Ohio June 18, 2010) (unpublished)). The district court dismissed plaintiffs' original complaint in its entirety, holding that plaintiffs' breach of contract claim was time-barred by Ohio's four-year statute of limitations, ORC § 2305.041, and that none of plaintiffs' tort and quasi-contract claims were separate and distinct from the underlying contract action because they did not allege any obligations apart from those imposed by the leases. In a subsequent order, the court denied plaintiffs' motion to alter or amend the judgment or, in the alternative, for relief from the judgment. (*See also Lutz v. Chesapeake Appalachia, LLC*, No. 4:09CV2256, 2010 WL 4823225 (N.D. Ohio Nov. 22, 2010) (unpublished)).

Plaintiffs timely appeal the district court's orders. In their appellate brief, they challenge only the district court's dismissal of their breach of contract claim. Thus, any objections to the court's dismissal of their tort and quasi-contract claims, or to the denial of their motion for leave to amend the complaint, are deemed abandoned. *Severe Records, LLC v. Rich*, 658 F.3d 571, 578 n.6 (6th Cir. 2011); *Johnson v. City of Detroit*, 446 F.3d 614, 618 n.3 (6th Cir. 2006).

## II.

We review de novo the district court's order dismissing plaintiffs' complaint pursuant to Rule 12(b)(6). *Metz v. Unizan Bank*, 649 F.3d 492, 496 (6th Cir. 2011). In doing so, we construe the complaint in a light most favorable to plaintiffs, accept all plausible well-pled factual allegations as true, and draw all reasonable inferences in

plaintiffs' favor. *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012). "Despite this liberal pleading standard, we may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *Id*. (citation and internal quotation marks omitted). "Rather, the complaint has to 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "If the [plaintiffs] do 'not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Generally, a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is an "inappropriate vehicle" for dismissing a claim based upon a statute of limitations. *Cataldo v. U.S. Steel Corp*., 676 F.3d 542, 547 (6th Cir. 2012). However, dismissal is warranted if "the allegations in the complaint affirmatively show that the claim is time-barred." *Id*. "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run," and "[i]f the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations." *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001); *see also Evans v. S. Ohio Med. Ctr*., 659 N.E.2d 326, 329 (Ohio Ct. App. 1995) ("The bar of the statute of limitations is an affirmative defense . . . upon which the defendant bears the burden of proof at trial.").

In this diversity case, we are obliged to apply the substantive law of the forum state, Ohio, in accordance with the controlling decisions of its highest court. *Metz*, 649 F.3d at 496. If the highest court has not yet addressed the precise issue at hand, "we must predict how the court would rule by looking to all the available data," including intermediate appellate decisions. *Berrington v. Wal-Mart Stores, Inc*., 696 F.3d 604, 608 (6th Cir. 2012) (citation and internal quotation marks omitted).

III.

The parties do not dispute that the applicable statute of limitations governing plaintiffs' contract claim is ORC § 2305.041, which became effective on April 6, 2007, and changed the limitations period for the breach of a lease for oil or gas drilling from the fifteen-year time period for ordinary contract actions (ORC § 1302.98) to four years, consistent with the Uniform Commercial Code's statute of limitations for breach of contract involving the sale of goods.  U.C.C. § 2-725.

The bone of contention in this litigation is whether, as the district court concluded, plaintiffs' breach of contract claim for the underpayment of monthly natural gas royalties accrued in 1993 and 2000 when the two distinct underpayment schemes allegedly began, or whether, as plaintiffs posit, each monthly royalty underpayment constituted a separate breach triggering a new accrual period.  This is a novel question under Ohio law, and we glean from existing precedent that the Ohio courts would favor plaintiffs' interpretation of ORC § 2305.041 in these circumstances.

ORC § 2305.041 provides:

With respect to a lease or license by which a right is granted to operate or to sink or drill wells on land in this state for natural gas or petroleum and that is recorded in accordance with section 5301.09 of the Revised Code, an action alleging breach of any express or implied provision of the lease or license concerning the calculation or payment of royalties shall be brought within the time period that is specified in section 1302.98 of the Revised Code.  An action alleging a breach with respect to any other issue that the lease or license involves shall be brought within the time period specified in section 2305.06 of the Revised Code.

ORC § 2305.041.

ORC § 1302.98 (also known as U.C.C. § 2-275), incorporated by reference into Section 2305.041, states in pertinent part:  "(A) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . . (B) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."

The district court held that the breaches in this case occurred and the statute of limitations began running within the meaning of ORC § 1302.98(B) in 1993 when, as alleged in plaintiffs' complaint, the leases were breached by a change in the deduction methodology, and again in 2000 when the leases were breached by a change in the rate methodology. Affording plaintiffs a "reasonable time" (two years) after the enactment of ORC § 1302.98 so as not to offend the Ohio Constitution's retroactivity clause, the district court determined that plaintiffs should have brought their claims no later than April 6, 2009, two years after the enactment date of ORC § 2305.041.[3] Since plaintiffs' action was commenced on September 30, 2009, the district court concluded that plaintiffs' breach of contract claim was time-barred and therefore subject to dismissal.

In reaching this decision, the district court rejected plaintiffs' argument that each monthly royalty underpayment constituted a discrete breach triggering a new accrual period. Instead, the court, applying by analogy two takings cases involving the "continuing violation" doctrine—*State ex rel. Nickoli v. Erie Metroparks*, 923 N.E.2d 588 (Ohio 2010), and *Ohio Midland, Inc. v. Dep't of Transp.*, 286 F. App'x 905 (6th Cir. 2008)—held that the breach was not continuous so as to toll the limitations period.[4]

On appeal, plaintiffs challenge the district court's rationale and its reliance upon the *Nickoli* and *Ohio Midland* cases. Plaintiffs argue that, under Ohio law, their leases are essentially divisible contracts, with the bar of the statute of limitations running separately from the date of each monthly royalty payment. We agree.

---

[3]In this regard, the district court favorably cited *Groch v. Gen. Motors Corp.*, 883 N.E.2d 377, 409 (Ohio 2008) (holding that a two-year period after the enactment of a new statute of limitations meets constitutional requirements). On appeal, plaintiffs do not challenge this aspect of the district court's ruling.

[4]"Courts have allowed the statute of limitations to be tolled when: (1) there is some evidence of present [prohibited] activity giving rise to a claim of a continuing violation and at least one of the forbidden . . . acts occurs within the relevant limitations period; or (2) there is a longstanding and demonstrable policy of the forbidden activity." *Ohio Midland*, 286 F. App'x at 912 (citation and internal quotation marks omitted). In applying this exception, the courts "ha[ve] distinguished between 'continuing violations' and 'continuing effects of prior violations,' . . . and clarified that the present effects of past discrimination . . . do not trigger a continuing violation exception." *Id.* (citations and internal quotation marks omitted). In *Ohio Midland* and *Nickoli*, the plaintiffs-property owners attempted unsuccessfully to invoke the continuing violation doctrine to toll the statute of limitations and prevent the dismissal of their constitutional takings actions.

Although Ohio common law would appear to support the district court's determination that the continuous violation doctrine does not apply to plaintiffs' breach of contract claim,[5] we need not decide this issue because our review of the record indicates that the district court misunderstood the nature of plaintiffs' argument. Plaintiffs did not advance the continuing violation theory below; rather, they argued that their leases should be construed as divisible contracts, with each underpayment giving rise to a separate cause of action—a distinct legal concept that is well-established and has in fact been applied in the context of gas, oil, and mineral contracts.[6] Consequently, as a result of the district court's sua sponte application of the continuous violation doctrine and its apparent misapprehension of plaintiffs' claim, the question whether plaintiffs' leases were divisible contracts—the crux of the statute of limitations issue in this case—was never addressed by the court.

The Ohio courts have endorsed the principle of divisible contracts. In *Freeman Indus. Prods., LLC v. Armor Metal Group Acquisitions, Inc.*, 952 N.E.2d 543 (Ohio Ct. App. 2011), the Ohio Court of Appeals summarized the factors relevant to an assessment of severability:

> Whether a contract . . . is entire or divisible depends generally upon the intention of the parties, and this must be ascertained by the ordinary rules of construction, considering not only the language of the contract, but also, in cases of uncertainty, the subject-matter, the situation of the parties, and circumstances surrounding the transaction, and the construction placed upon the contract by the parties themselves. If the part to be performed by one party consists of several distinct and separate items, and the price is apportioned to each item, payable at the time of

---

[5]*See, e.g., Nickoli*, 923 N.E.2d at 594 (noting that "'courts have been extremely reluctant to apply this doctrine outside the context of Title VII'") (quoting *Nat'l Parks Conservation Assn., Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007)); *Vitek v. AIG Life Brokerage*, No. 06-cv-615, 2008 WL 4372670, at *5 (S.D. Ohio Sept. 22, 2008) (unpublished) ("[Plaintiff] has not cited any cases, nor is the Court aware of any, indicating that Ohio would entertain extending the continuing violation doctrine to breach of contract cases. The Court finds this theory is inapplicable to *any* of Vitek's claims [alleging breach of contract and tortious interference]."); *State ex rel. Eckstein v. Midwest Pride IV, Inc.*, 713 N.E.2d 1055, 1064 (Ohio Ct. App. 1998) ("Although the [continuing violation] theory can be used in contexts other than Title VII or employment discrimination, courts have been wary to do so.") (citations and internal quotation marks omitted).

[6]"The context of continuing—that is, periodic—accrual for periodic breach is to be distinguished from that of a single breach or other wrong which has continuing impact." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1389 (Cal. Ct. App. 2004). *See* Text, *infra*.

delivery, the contract will generally be held severable. . . . The primary criteria in determining whether a contract is entire or divisible is the intention of the parties as determined by a fair consideration of the terms and provision of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question. A factor in determining whether a contract is entire or severable is whether the parties reached an agreement regarding the various items as a whole or whether the agreement was reached by regarding each item as a unit.

*Freeman*, 952 N.E.2d at 550 (citation and internal quotation marks omitted).

Whether a contract is divisible or not impacts the running of the statute of limitations:

Where a contract is divisible and, thus, breaches of its severable parts give rise to separate causes of action, the statute of limitations will generally begin to run at the time of each breach; in other words, each cause of action for breach of a divisible part may accrue at a different time for purposes of determining whether an action is timely under the applicable statute of limitations. If, on the other hand, a continuing contract is entire and indivisible, an action can be maintained on it only when a breach occurs or the contract is in some way terminated, and the statute of limitations will begin to run from that time only.

15 Williston on Contracts § 45.20 (4th ed. 2000).

Applying these principles, the Ohio courts, and federal courts applying Ohio law, have deemed different kinds of contracts to be divisible, with each default in a periodic or installment payment giving rise to a separate cause of action. *See, e.g., Everhart v. State Life Ins. Co.*, 154 F.2d 347, 356 (6th Cir. 1946) (insurance policy); *Vitek*, 2008 WL 4372670 at *9 (contract to sell insurance); *Bacik v. Indus. Const. Co., Inc.*, No. 1:05 CV 2329, 2006 WL 1735266, at *5-6 (N.D. Ohio 2006) (unpublished) (pension contract); *Lancaster Colony Corp. v. Lindley*, 400 N.E.2d 905, 907 (Ohio 1980) (franchise tax repayments); *Blake Homes, Ltd. v. FirstEnergy Corp.*, 877 N.E.2d 1041, 1046 (Ohio Ct. App. 2007) (citing *Blake Homes, Ltd. v. FirstEnergy Corp.*, No. L-03-1109, 2004 WL 367929, at *3 (Ohio Ct. App. 2004) (unpublished)) (construction contract); *O'Brien v. Ravenswood Apts., Ltd.*, 862 N.E.2d 549, 558 (Ohio Ct. App. 2006) (land installment

contract); *Cadle Co. II, Inc. v. HRP Auto Ctrs., Inc.*, No. 84296, 2004 WL 2677373, at *2 (Ohio Ct. App. 2004) (unpublished) (cognovit demand note); *Eden Realty Co. v. Weather-Seal, Inc.*, 142 N.E.2d 541, 544–45 (Ohio Ct. App. 1957) (real-property lease agreement). *But see Fouss v. East Ohio Gas Co.*, No. 89-CA-03, 1989 WL 63279, at *2–3 (Ohio Ct. App. 1989) (unpublished) (holding that the breach of a gas purchase contract occurred and the limitations period commenced with the first payment at a rate contrary to the originally agreed-upon price, where the defendant repudiated the contract price by letter, resulting in a clear anticipatory breach, and the contract did not provide for a set payment or delivery schedule, or a prescribed quantity to be delivered).[7]

The question whether a gas, oil, or mineral lease providing for monthly royalty payments is divisible for statute of limitations purposes under Ohio law is a novel question. However, courts interpreting the law of other states have found such contracts to be apportionable and severable in this context. For instance, in *Moore v. Millers Cove Energy Co.*, No. 98-6279, 215 F.3d 1327, 2000 WL 658052 (6th Cir. 2000) (unpublished table decision), our court, applying Virginia law, held in a suit brought by coal-mining lessors against the lessees for breach of a covenant to mine that the coal leases in question were divisible contracts and that a separate cause of action accrued with each deficient royalty payment:

> [T]here is no single cause of action that accrued immediately upon the [defendants'] failure to mine. A cause of action did not accrue until [the plaintiff] was injured— that is, until the next monthly royalty payment came due and the [defendants] paid a reduced amount. Thereafter, because the leases required the [defendants] to make a new payment of per-ton royalties every month, a distinct injury occurred—and a separate cause of action accrued—with every reduced or missing payment. The [defendants'] obligation is divisible, and the statute of limitations does not bar the entirety of [plaintiffs'] action. The statute precludes recovery

---

[7] One notable exception to the theory of divisible contracts arises when the terms of a contract are clearly repudiated by a party. In such a case, a cause of action for breach of contract accrues only once—at the time of repudiation. *See* 52 Ohio Jur. 3d, Guaranty and Suretyship § 169 (2012); *Fouss*, 1989 WL 63279 at * 2–3; *Wrubel v. Muth*, 11 Ohio C.C. 559, 1896 WL 1420, at * 2–3 (Ohio Cir. 1896). In the instant case, because there was no "statement or voluntary affirmative act indicating that [defendants] will commit a breach when performance becomes due," *R.C. Beeson, Inc. v. Coca Cola Co.*, 337 F. App'x 241, 244 (3d Cir. 2009) (citation and internal quotation marks omitted), defendants' reliance upon *Fouss* and *R.C. Beeson, Inc.* is misplaced.

only for the portion of the action that accrued more than five years before [plaintiffs] filed suit.

*Moore*, 2000 WL 658052 at *4.

Likewise, in *Armstrong Petroleum Corp.*, 116 Cal. App. 4th at 1390–91, the court held in a breach of contract dispute that monthly payments and deliveries made to a non-operator for its net revenue interest in oil and gas production were divisible from one another for statute of limitations purposes and accrued periodically, and, therefore, the plaintiff's claims relating to monthly performance occurring within four years (the limitations period) of the filing of the complaint were timely.  Framing the issue as whether "this [is] a case where there was only one wrong and one accrual date, or a new, distinct wrong each month with its own accrual date," *id*. at 1387, the court found the latter:

> The subject matter of the [contract] and related exhibits is the production of gas and oil, over time, from the Webb Tract.  The amount of money [plaintiff] derives from its net revenue interest depends upon the production and sale of gas, and neither the quantity of production nor the revenue it will generate can be determined in advance.  Based on these undisputed facts, there is nothing inherent in the subject matter that would prevent the separation of [the defendant's] payment or delivery obligation concerning production from a particular period from its obligation to [plaintiff] concerning production from a subsequent or prior period.  Rather, the continuing nature of the production readily lends itself to division by the parties because gas produced during one time period is easily separated from gas produced during another time period.
>
> Because the parties used a monthly accounting procedure, because the amount of periodic deliveries or payments could not be determined in advance, and because gas production is by its nature divisible, we conclude the objective manifestation of the parties' intent is that [defendant's] performance of part of its obligations to [plaintiff] by making a monthly payment or delivery is divisible from its obligations to make other monthly payments or otherwise satisfy [plaintiff's] net revenue interest.

*Id*. at 1390–91 (citation omitted).

In other words, "[b]ecause the act of paying or delivering the wrong amount constituted the breach of contract and caused damage in the amount of the underpayment or underdelivery, . . . all of the elements of a cause of action relating to a breach of that monthly obligation did not occur, and thus a cause of action did not accrue, until [defendant] made the incorrect payment or delivery for that month." *Id*. at 1391. *See also Harrison v. Bass Enters. Prod. Co*., 888 S.W.2d 532, 537 (Tex. Ct. App. 1994) (holding that the claims by a royalty interest owner in oil wells for unpaid royalties "'accrued' monthly [under Texas's four-year statute of limitations] as oil and gas are produced and the agreed royalty is not paid"); *Hondo Oil & Gas Co. v. Texas Crude Operator*, 970 F.2d 1433, 1440 (5th Cir. 1992) ("Where a contract provides for monthly payments and not a present sale of gas or oil, a cause of action accrues [under Texas law] when any given monthly payment is due. Only those payments due more than four years before the suit was filed are barred.") (citation and internal quotation marks omitted); *Rupe v. Triton Oil & Gas Corp*., 806 F. Supp. 1495, 1498 (D. Kan. 1992) ("Under Kansas law, a cause of action for breach of an obligation to make payments under a continuing [gas purchase] contract generally accrues at the time each payment becomes due, thus giving rise to a separate cause of action for each failure to make payment when due.").

In a class action that recently settled in the United States District Court for the Western District of Virginia—a suit that closely paralleled the allegations in the instant case and involved the present defendants—the district court adopted that magistrate judge's report and recommendation that

> [plaintiff] should be allowed to pursue her claims for any underpayments made within five years prior to filing. [Plaintiff] alleges that the underpayment of royalties occurred due to several reasons. Among these reasons are that the defendants underreported the volume of gas produced each month, underreported the amount paid for the gas and sold the gas at below-market prices. Unlike a specific deduction from royalties, which begins at a point in time and continues, underpayment due to the above reasons would be separate independent breaches, subject to separate accrual dates. Therefore, . . . the court find[s] that [plaintiff] has pled facts sufficient to pursue her breach of contract claim for any underpayments of royalties within five years prior to filing of this claim.

*Healy v. Chesapeake Appalachia, LLC*, No. 1:10cv00023, 2011 WL 24261, at *10 (W.D. Va. Jan. 5, 2011) (unpublished); *see also Adkins v. EQT Prod. Co.*, No. 1:11CV00031, 2011 WL 6178438, at *2, 8 (W.D. Va. Dec. 13, 2011) (unpublished) (holding that the alleged monthly underpayment of methane gas royalties constituted "discrete breaches of contract for which [plaintiff] can recover up to five years before her complaint was filed").

The fact that the Ohio courts have endorsed contract divisibility in other contexts, considered in tandem with these oil and gas cases involving similarly structured royalty contracts, provides persuasive authority for our conclusion that the Ohio courts would find plaintiffs' breach of contract claims alleging monthly royalty underpayments to be divisible contractual obligations under ORC § 2305.041.

In their complaint, plaintiffs allege that Chesapeake "continued [the alleged] improper and fraudulent practices until at least January of 2007, and perhaps to the present." Viewing the complaint in a light most favorable to plaintiffs and taking their well-pled allegations as true, we conclude that the district court erred when it held that defendants' actions in making monthly royalty underpayments over the course of many years were an inseparable continuation of the original breaches that allegedly began in 1993 and 2000 and that plaintiffs' claims were barred in their entirety. Thus, we hold that plaintiffs are permitted to pursue their breach of contract claim pertaining to any underpayments of royalties that occurred within the four years prior to the filing of their complaint in September 2009.

IV.

Plaintiffs argue that the applicable four-year limitations period should be expanded by the application of the discovery rule or the fraudulent concealment doctrine.[8] The Ohio courts have not yet spoken on which tolling concepts apply to ORC § 2305.041.

---

[8]Contrary to defendants' assertion that plaintiffs' tolling arguments are not preserved on appeal, plaintiffs raised this argument in their Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss.

Under Ohio law, the discovery rule "provides that a cause of action does not arise until the plaintiff knows, or by the exercise of reasonable diligence should know, that he or she has been injured by the conduct of the defendant." *Flagstar Bank, F.S.B. v. Airline Union's Mortg. Co.*, 947 N.E.2d 672, 675–76 (Ohio 2011). When not expressly codified by statute, the discovery rule has been invoked by the Ohio courts in certain "situations where the injury complained of may not manifest itself immediately and, therefore, fairness necessitates allowing the assertion of a claim when discovery of the injury occurs beyond the statute of limitations." *NCR Corp. v. U.S. Mineral Prods. Co.*, 649 N.E.2d 175, 177 (Ohio 1995); *see also Cristino v. Ohio Bur. of Workers' Comp.*, 977 N.E.2d 742, 757 (Ohio Ct. App. 2012).[9]

ORC § 2305.041 adopts "the time period that is specified in section 1302.98 of the Revised Code." Plaintiffs contend that it was the Ohio General Assembly's intent to incorporate only the four-year limitations period set forth in subsection (A) of § 1302.98, but not the language in subsection (B) that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." ORC § 1302.98(B). According to plaintiffs, application of the discovery rule is warranted here, because defendants' alleged fraudulent misrepresentations could not be discerned from the face of the royalty checks and, consequently, plaintiffs did not discover the underpayments until shortly before they filed their complaint, nor could they have discovered them earlier because they "had no practical way to independently determine the amount of royalty payments due them and reasonably relied on Chesapeake to truly, accurately and properly carry out its duties . . . to account for them correct amounts[.]"

Conversely, defendants argue that "the time period" mentioned in § 2305.041 refers to *all* of § 1302.98, including subsection (B), which has been construed by the Ohio Court of Appeals as precluding application of the discovery rule. *See Foster v. Wells Fargo Fin. Ohio, Inc.*, 960 N.E.2d 1022, 1025 (Ohio Ct. App. 2011) ("[T]here is

---

[9]"Absent legislative definition, it is left to the judiciary to determine when a cause of action 'arose.'" *O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727, 730 (Ohio 1983).

no discovery rule or some other tolling doctrine applicable to the statute of limitations for breach of contract for the sale of goods [under ORC § 1302.98].”); *cf. Zaremba v. Marvin Lumber & Cedar Co.*, 458 F. Supp. 2d 545, 551 (N.D. Ohio 2006) (holding in a breach of warranty action that “[t]he discovery of the defective [product] . . . does not re-trigger the running of the four-year limitations period [in § 1302.98] and is, consequently, unavailing”); *Hahn v. Jennings*, No. 04AP-24, 2004 WL 2008474, at \*7 (Ohio Ct. App. Sept. 9, 2004) (unpublished) (“We know of no case in which a tort-style discovery rule has been applied to a breach of express warranty action sounding in contract [under § 1302.98].”).

ORC § 2305.041 does not expressly incorporate § 1302.98(B)’s proscription on the use of the discovery rule.  The statute is, as the parties’ respective viewpoints demonstrate, imprecisely drafted and “susceptible of more than one reasonable interpretation.”  *Bailey v. Rep. Engineered Steels, Inc.*, 741 N.E.2d 121, 123 (Ohio 2001).  “In determining legislative intent when faced with [such] an ambiguous statute, the court may consider several factors, including the object sought to be obtained, circumstances under which the statute was enacted, the legislative history, and the consequences of a particular construction.”  *Id.*  Specifically, in deciding whether to apply a discovery rule to toll a particular statute of limitations, the Ohio courts have deemed it essential to balance “the rationale underlying the statute of limitations with the interests and equities invoked in situations where the injury complained of may not manifest itself immediately.”  *Mattlin Holdings, LLC v. First City Bank*, 937 N.E.2d 1087, 1090 (Ohio Ct. App. 2010) (citation and internal quotation marks omitted); *see also O’Stricker*, 447 N.E.2d at 731 (“[T]he court must weigh the impact on each party of strict accrual . . . with a more liberal policy (such as a ‘discovery rule’).”).  “The rationale underlying statutes of limitations is fourfold:  to ensure fairness to defendant; to encourage prompt prosecution of causes of action; to suppress stale and fraudulent claims; and to avoid the inconvenience engendered by delay, specifically the difficulties of proof present in older cases.”  *O’Stricker*, 447 N.E.2d at 731.

The stated purpose of the Ohio General Assembly's amendment to § 2305.041 was to "establish uniformity on the statute of limitations related to royalties from the sale of crude oil and natural gas, consistent with Ohio's Uniform Commercial Code." Committee Notes to H.B. 443 as reported by the House Agriculture & Natural Resources Committee Dec. 6, 2006. The General Assembly recognized that

> [t]he oil and gas industry has changed dramatically during the last 25 years, especially with regard to the manner in which natural gas is marketed and sold. . . . While the marketplace has dramatically changed, many producing wells are governed by oil and gas leases and licenses which were signed decades ago and which do not reflect current procedures. This has lead to friction throughout the United States between the current realities of the marketplace and the outdated language in many oil and gas leases.
>
> The Courts in Ohio and other oil and natural gas producing states have recognized that these types of oil and gas instruments have some elements of real estate leases and some elements of commercial contracts. The Courts have also recognized that contracts for the sale of oil and gas are governed by the Uniform Commercial Code. (O.R.C. Ch. 1302).
>
> The Statute of Limitations for the contracts where producers buy the hydrocarbons from the landowners should be consistent with the Statute of Limitations governing the contracts where producers then resell those hydrocarbons to marketers or consumers. This amendment would accomplish that result.

*Id.*

The Official Comment to ORC § 1302.98, in turn, explains that "[t]he purpose of this section is to introduce a uniform statute of limitations for sales contracts, thus eliminating the jurisdictional variations and providing needed relief for concerns doing business on a nationwide scale whose contracts have heretofore been governed by several different periods of limitation depending upon the state in which the transaction occurred." ORC § 1302.98. The statute "takes sales contracts out of the general laws limiting the time for commencing contractual actions and selects a four-year period as the most appropriate to modern business practice." *Id.*

Although the legislative history of § 2305.041 does not definitively answer the question before us, the goal of uniformity expressed by the Ohio General Assembly in enacting § 2305.041 suggests that the Ohio courts would adhere to their reluctance to apply the discovery rule in commercial transaction cases such as the present royalty dispute, where the alleged harm is purely financial in nature. *See, e.g., Foster*, 960 N.E.2d at 1025 ("[T]here is no discovery rule . . . applicable to [§ 1302.98]."); *Mattlin Holdings, LLC*, 937 N.E.2d at 1090–91 (concluding that the UCC's interest in finality and predictability outweighed the interest in recovering damages in holding that the discovery rule did not apply to toll the three-year limitations period governing an Ohio UCC conversion claim where the plaintiffs failed to allege fraudulent concealment); *Palmer Mfg. & Supply v. BancOhio Nat'l Bank*, 637 N.E.2d 386, 390 (Ohio 1994) (holding that, where fraudulent concealment was not alleged, "four years is ample time for a prudent business or individual, exercising due diligence, to discover a forgery and bring an action for conversion[,]" because"[s]trict application of the limitations period, while predictably harsh in some cases, best serves the twin  goals of swift resolution of controversies and certainty of liability advanced by the UCC") (citation and internal quotation marks omitted); *see also Metz*, 649 F.3d at 497–98 (in which our court, citing Ohio law and "consisten[cy] with the treatment of statutes of limitations for UCC claims in the majority of other jurisdictions," declined to apply the discovery rule to the plaintiffs' Ohio UCC conversion claims).[10]

Furthermore, the general rule in Ohio is that a cause of action accrues, and a statute of limitations begins to run, when the wrongful act is committed. *Flagstar Bank*, 947 N.E.2d at 675; *Harris v. Liston*, 714 N.E.2d 377, 379 (Ohio 1999); *O'Stricker*, 447 N.E.2d at 730.  For contract claims, this means that a breach of contract action accrues when the breach occurs or when the complaining party suffers actual damages as a result

---

[10]*See also* the following cases declining to apply the discovery rule to Ohio's UCC provisions. *Bandy v. Fifth Third Bank*, No. 1:08 CV 1064, 2011 WL 4463415, at *6 (N.D. Ohio Sept. 27, 2011) (unpublished); *Thrower v. Bolden*, No. 97813, 2012 WL 3765035, at *4 (Ohio Ct. App. Aug. 30, 2012) (unpublished); *Connors v. U.S. Bank*, No. 07AP-649, 2008 WL 1759071, at *6 (Ohio Ct. App. Apr. 17, 2009) (unpublished); *W. Ohio Colt Racing Ass'n v. Fast*, No. 10-08-15, 2009 WL 737776, at *5 (Ohio Ct. App. Mar. 23, 2009) (unpublished); *Brentar v. Rupert*, No. 73903, 1998 WL 895285, at *2–3 (Ohio Ct. App. Dec. 17, 1998) (unpublished).

of the breach.  *Columbus Green Bldg. Forum v. State*, 980 N.E.2d 1, 10 (Ohio Ct. App. 2012) (citing *Kincaid v. Erie Ins. Co.*, 944 N.E.2d 207, 210 (Ohio 2010)).

The discovery rule is a cautiously applied exception to the general rule and, "[b]y its very nature . . . must be specially tailored to the particular context in which it is to be applied."  *Flagstar Bank*, 947 N.E.2d at 675–76 (citation and internal quotation marks omitted); *Metz*, 649 F.3d at 497 ("The discovery rule is an exception [under Ohio law] and only applies in situations where the wrongful act does not immediately result in injury or damage.") (citations and internal quotation marks omitted).  Its purpose "is to limit the unconscionable result to innocent victims who by exercising even the highest degree of care could not have discovered the cited wrong."  *Al-Mosawi v. Plummer*, No. 24985, 2012 WL 6674490, at *4 (Ohio Ct. App. Dec. 21, 2012) (citation and internal quotation marks omitted).

The Ohio courts have employed the discovery rule in several areas of the law, including medical malpractice, fraud, wrongful death, toxic exposure, and negligent credentialing cases.  *See  Flagstar Bank*, 947 N.E.2d at 676 (and cases cited therein).  Thus far, however, the Ohio courts have not judicially adopted the discovery rule in strictly commercial transaction cases in the absence of fraud, and "[n]o Ohio court has applied the discovery rule to a claim for breach of contract."  *Cristino*, 977 N.E.2d at 757 (citing *Vitek*, 2008 WL 4372670, and *Settles v. Overpeck Trucking Co.*, No. CA93-05-083, 1993 WL 534700 (Ohio Ct. App. 1993), in refusing to apply the discovery rule to the plaintiff's breach of contract claim stemming from a workers' compensation settlement dispute).  The *Cristino* court "[was] not inclined to be the first court to do so." *Id*.

To apply the discovery rule to § 2305.041, therefore, would not only be a departure from the public policy underlying the statute (a uniform limitations period for UCC transactions involving contracts for the sale of goods), but also from Ohio's general default rule regarding accrual.  Despite plaintiffs' argument that they had no way to independently ascertain the irregularities in their monthly royalty payments, they have not shown a compelling reason to deviate from the normal four-year limitations period,

particularly since it has been recognized that in such a contractual dispute, "royalty owners have some obligation to exercise reasonable diligence in protecting their interests," including "the need to exercise due diligence in enforcing contractual rights, in determining whether charges are proper and reasonable, and in determining whether to perform additional investigation to protect their interests." *Holland v. Thompson*, 338 S.W.3d 586, 595 (Tex. Ct. App. 2010) (holding that the discovery rule did not apply to toll the limitations period in an action alleging fraud in the sale of mineral interests). The fact that defendants may have fraudulently concealed information from plaintiffs may be grounds to invoke tolling on equitable principles under the fraudulent concealment doctrine, *see* Section V *infra*, but it does not alter our conclusion that the Ohio courts would not extend the narrow discovery-rule exception to this breach-of-contract action.

Moreover, applying the standard rules of statutory construction, the General Assembly's express inclusion of a discovery rule for certain UCC transactions, *see* ORC §§ 1304.18(F) and 1304.17(E),[11] but not the sale of oil and gas under § 2305.041, weighs against its use in this case. *See Bandy*, 2011 WL 4463415, at *6 (declining to apply the discovery rule to an Ohio UCC claim in part on the ground that "[t]he legislature has included a discovery rule in other provisions . . . and therefore, if it had intended for one to exist with regard to these statutes, it would have merely placed this similar language in the statute"); *cf. Investors REIT One v. Jacobs*, 546 N.E.2d 206, 210 (Ohio 1989) ("The legislature's express inclusion of a discovery rule for certain torts . . . including fraud and conversion, implies the exclusion of other torts arising under the statute, including negligence").

These factors, coupled with the General Assembly's explicit bar on the discovery rule in § 1302.98(B), strongly suggest that when it incorporated § 1302.98's "time period" into § 2305.041, the General Assembly did not intend to supplement the statute of limitations with the discovery rule, but rather sought to remain consonant with

---

[11]ORC §§ 1304.18(F) and 1304.17(E) provide that a cause of action for breach of warranty "accrues when the claimant has reason to know of the breach").

§ 1302.98 and "advance[] the UCC objectives of negotiability, finality, and uniformity in commercial transactions." *Palmer Mfg. & Supply, Inc.*, 637 N.E.2d at 390.

Mindful that "[f]ederal courts should be extremely cautious about adopting substantive innovation in state law," *Berrington*, 696 F.3d at 608 (citation and internal quotation marks omitted), we conclude that the discovery rule is not applicable to toll the statute of limitations, ORC § 2305.041, governing plaintiffs' contract claim.

V.

Although the discovery rule is not available to plaintiffs in the absence of an allegation of fraud, the Ohio courts have made it clear that "[t]he doctrine of equitable tolling may be employed to prohibit inequitable use of the statute of limitations" in "compelling cases which justify a departure from established procedure," with fraudulent concealment being one basis for invocation of the doctrine. *Frees v. ITT Technical School*, No. 23777, 2010 WL 4323026, at *5 (Ohio Ct. App. 2010) (citation and internal quotation marks omitted); *see also Mattlin*, 937 N.E.2d at 1091 ("[I]n the absence of fraudulent concealment by the party against whom the claim for conversion is brought, the statute of limitations set forth in R.C. 1303.16(G) is not tolled by a discovery rule."); *Palmer Mfg. & Supply, Inc.*, 637 N.E.2d at 390 ("Where a party not engaging in fraudulent concealment asserts the statute of limitations defense, most courts have refused to apply the discovery rule to negotiable instruments, finding it contrary to UCC policies of finality and negotiability.").

Under the fraudulent concealment doctrine, a statute of limitations may be tolled "where there is some conduct of the adverse party, such as misrepresentation, which excludes suspicion and prevents inquiry." *Bryant v. Doe*, 552 N.E.2d 671, 675 (Ohio Ct. App. 1988). To invoke equitable tolling on this ground, a plaintiff must show that the defendant engaged in a course of conduct to conceal evidence of the alleged wrongdoing, and that the plaintiff, despite the exercise of due diligence, failed to discover the facts supporting the claim. *Frees*, 2010 WL 4323026 at *5. The right to rely upon fraudulent concealment "never continues beyond the time that a plaintiff, by

exercising reasonable diligence, should have discovered the facts at issue." *Zemcik v. LaPine Truck Sales & Equip. Co.*, 706 N.E.2d 860, 865 (Ohio Ct. App. 1998).

Plaintiffs urge application of the fraudulent concealment doctrine to toll the limitations period, but defendants argue that plaintiffs' complaint is deficient in this regard.

"The Federal Rules of Civil Procedure, which control pleading in diversity cases, . . . require that the acts constituting fraudulent concealment of a claim be pled in the complaint." *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 851 (6th Cir. 2006) (citing Fed. R. Civ. P. 9(b)).  Plaintiffs must plead three elements:  "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence." *Id.* (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)).

Here, we conclude that plaintiffs have met the pleading requirements.  Regarding the first prong, the complaint is rife with allegations that Chesapeake deliberately miscalculated royalty payments and misrepresented these calculations to the lessors. The complaint alleges that "[b]eginning in 1993, [Chesapeake's predecessor] deceitfully and secretly began the new practice of deducting various post production costs, . . . all without any notice to its lessors"; that Chesapeake "deliberately falsified the monthly accounting statements," "deceitfully reduced the price of gas . . . used in the royalty formula," and "deceitfully reduced the volumes of gas used in the royalty formula"; and that from 1999 to 2006, Chesapeake "used the low, artificial fixed prices in the forward sales," rather than the much higher market price.  These detailed factual allegations, which include specific dates and an identification of what facts were misrepresented, are sufficient to allege that defendants wrongfully concealed their actions.

The second prong of the test is uncontested by defendants as they do not argue that plaintiffs had discovered the operative facts at the basis of their breach of contract claim within the limitations period.

Therefore, the third prong becomes determinative. Plaintiffs are required to allege that they exercised due diligence until the facts that form the basis of the complaint were discovered. *Dayco Corp.*, 523 F.2d at 394. Plaintiffs alleged that they "rel[ied] on"—and therefore presumably read—the reports and documents that Chesapeake furnished to them. Because the reports omitted true information and contained intentional misrepresentations, defendants denied plaintiffs the "means of discovering [their] cause of action." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 448 (6th Cir. 2012); *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1127 (6th Cir. 1982). As alleged in the complaint, there was thus "no practical way to independently determine the amount of royalty payments due . . . ."

We conclude that plaintiffs' allegations regarding due diligence are sufficient to require further analysis by the district court. We have noted that only "[i]nformation sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence." *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985). Plaintiffs allege that a reasonably prudent person would have had no way of knowing about the fraud due to the inaccuracies of the reports. If they are able to prove this allegation, they may be entitled to equitable tolling on the basis of fraudulent concealment. If in fact plaintiffs *did* have sufficient information to trigger their duty to investigate, then equitable tolling may not be appropriate. *Cf. Au Rustproofing*, 755 F.2d at 1237 (holding that the plaintiff's duty to exercise due diligence was triggered because plaintiff should have known about the fraudulent affidavits at issue based on a letter from the defendant to the plaintiff); *Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1333 (Ohio Ct. App. 1993) (holding that the plaintiff's duty to exercise due diligence was triggered because information on the cover of an insurance policy "was sufficient to require a reasonable person who believed she was simply adding a name to an existing policy to inquire into the possibility of wrongdoing"). In either case, these are questions for summary judgment or for trial, and they should not be resolved on a motion to dismiss. Where there is "some question as to the depth and scope of [the plaintiffs'] investigation, [the plaintiffs] should be allowed to proceed forward." *Carrier Corp.*, 673 F.3d at 448 (reversing and

remanding the district court's dismissal of a fraudulent concealment claim "at such an early stage of litigation and without the benefit of discovery").

Therefore, we hold that plaintiffs' allegations are sufficient to survive a motion to dismiss.  Plaintiffs could have made their fraudulent concealment argument more prominent in their opposition to defendants' motion to dismiss, but they nonetheless presented the argument, and the district court failed to consider it.

## VI.

For the foregoing reasons, we reverse, in part, that portion of the district court's judgment dismissing plaintiffs' breach of contract claim, affirm the remainder of the judgment, and remand the case to the district court for further proceedings consistent with this opinion.