NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0194n.06

No. 19-3315

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Apr 03, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| REGIS F. LUTZ, MARION L. LUTZ, LEONARD YOCHMAN, JOSEPH L. YOCHMAN, C.Y.V. LLC, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE NORTHERN DISTRICT OF |
| CHESAPEAKE APPALACHIA, L.L.C., | ) ) | OHIO |
| Defendant-Appellee. | ) | |

**BEFORE:** **STRANCH, READLER, and MURPHY, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.** How to calculate royalty payments under natural gas contracts has resulted in a spate of litigation in several states against various gas companies. Plaintiffs pursued a similar course of litigation here. At summary judgment, the district court held that Plaintiffs had failed to bring their royalty claims within Ohio's four-year limitations period, and that they similarly had failed to show that the limitations period should be tolled. With the case now on appeal, we are asked to resolve whether Plaintiffs' failure to meet the limitations period should be excused because Defendant Chesapeake Appalachia fraudulently concealed both the submarket prices it used to calculate royalty payments and the deductions it made from those payments for production costs. Seeing no error in the district court proceedings, we **AFFIRM** its judgment.

## I.  BACKGROUND

For more than 30 years, Chesapeake Appalachia and its corporate predecessors have leased parcels of land that contain natural gas deposits in several states along the Appalachian Plateau. Plaintiffs own several of the leased parcels that run along the Ohio-Pennsylvania border.  Each lease agreement requires Chesapeake to pay the respective Plaintiff/lessor monthly royalties equal to 1/8th of the market value of the gas produced.  To show how the royalty payments are calculated, Chesapeake sends monthly check stubs to each Plaintiff/lessor.  The stubs disclose the volume of gas produced, the price paid per unit, and the portion of the production costs allocated to the lessor.

The parties have a long-running dispute over whether Chesapeake properly calculated those royalty payments.  In 2009, that dispute boiled over into litigation.  Invoking our diversity jurisdiction, Plaintiffs brought a putative class action against Chesapeake.  Plaintiffs alleged that "[b]eginning in at least 1993," Chesapeake breached the royalty provisions of the natural gas leases by paying Plaintiffs significantly less than the market price for natural gas as well as by misreporting the volume of gas produced and the production costs charged to the lessors.  The district court initially dismissed Plaintiffs' claims as time-barred under the applicable Ohio four-year limitations period, finding that the limitations period began to run with the first monthly royalty payment in 1993, and that the payments were not divisible for limitations purposes.  *Lutz v. Chesapeake Appalachia, LLC*, No. 4:09-cv-2256, 2010 WL 2541669, at *4 (N.D. Ohio June 18, 2010).

We reversed.  To our eye, each royalty payment was a divisible contractual obligation under Ohio law, each with its own four-year limitations period.  *Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 470 (6th Cir. 2013).  We accordingly held that Plaintiffs' claims regarding payments made after September 2005 were not time-barred.  *Id.*  As to earlier payments, the issue

before us again today, we found that Plaintiffs, for purposes of overcoming a motion to dismiss, had sufficiently alleged that Chesapeake fraudulently concealed the basis for Plaintiffs' pre-2005 claims. *Id.* at 475–76. We thus remanded the dispute back to the district court to consider, with the benefit of discovery, whether such concealment tolled the statute of limitations. *Id.* at 476.

Discovery did not prove helpful to Plaintiffs. During discovery, they admitted that they had barely looked at the check stubs sent along with the royalty payments. In particular, they admitted they neither compared the pay rate column to the publicly available market prices for natural gas, nor examined the column that reflected deductions for production costs. And they conceded they could easily have reached out to Chesapeake with questions regarding any aspect of their royalty payments, but did not.

These admissions, the district court concluded, undermined Plaintiffs' claim that the alleged underpayments were fraudulently concealed to prevent discovery by Plaintiffs. "[I]f plaintiffs expect to toll the statute of limitations" under Ohio law, the district court observed, "due diligence requires that they had checked" the stubs Chesapeake sent them. Yet Plaintiffs failed to undertake any investigation—neither by examining their check stubs, consulting available market prices, nor contacting Chesapeake. Accordingly, the district court held that Plaintiffs' pre-September 2005 claims were time-barred, awarding Chesapeake summary judgment as to those claims.

Plaintiffs now appeal that ruling. Although Plaintiffs' notice of appeal was not limited to the issue of fraudulent concealment as to Plaintiffs' pre-2005 claims, the parties agree that this appeal is confined solely to that issue.

## II. ANALYSIS

We review *de novo* the district court's decision to grant summary judgment to Chesapeake. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). And we start that review with a few points of agreement. All agree that, in this diversity suit, we apply Ohio law in resolving Plaintiffs' appeal. *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013); *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (holding that, in conducting a state-law analysis, decisions of the state's highest court bind federal courts and, in the absence of such authority, federal courts must "anticipate how [that] court would rule" by consulting the decisions of the state's intermediate appellate courts, among other things). All agree that, under Ohio law, the limitations period for Plaintiffs' contract claim is four years. *See* Ohio Rev. Code § 2305.041 (applying Ohio Rev. Code § 1302.98's four-year limitations period to royalty disputes arising under gas leases). All agree that Plaintiffs' earliest claims date back to 1993, and that they did not file suit until 2009. And all agree that, in view of the four-year limitations period, claims involving conduct occurring before September 2005 fall outside the limitations period.

Now to the point of disagreement. Plaintiffs believe the statute of limitations should be tolled under the doctrine of fraudulent concealment. Their theory is that Chesapeake misreported to them much of the information underlying how their royalty payments were calculated, including the volume of gas harvested, the price per unit for which Chesapeake sold the gas, and the portion of Chesapeake's production costs charged to Plaintiffs. We thus consider those contentions against the backdrop of Ohio law.

Devised from the broader principles of equitable estoppel, the doctrine of fraudulent concealment serves to toll a limitations period where a defendant impermissibly conceals its wrongdoing from the plaintiff. *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 278–79 (Ohio

2006).  To invoke equitable estoppel on grounds of fraudulent concealment here, Plaintiffs must show:  "(1) a factual misrepresentation, (2) that the misrepresentation is misleading, (3) that the misrepresentation induced actual reliance that was reasonable and in good faith, and (4) that it caused detriment to the relying party."  *Hoeppner v. Jess Howard Elec. Co.*, 780 N.E.2d 290, 297 (Ohio Ct. App. 2002); *see also, e.g.*, *Mark-It Place Foods, Inc. v. New Plan Excel Realty Tr.*, 804 N.E.2d 979, 998 (Ohio Ct. App. 2004); *Myers v. Myers*, 768 N.E.2d 1201, 1205–06 (Ohio Ct. App. 2002); *Gruber v. Kopf Builders, Inc.*, 770 N.E.2d 598, 603 (Ohio Ct. App. 2001).  Plaintiffs' burden is a heavy one; they must show "subsequent and specific actions by [Chesapeake that] somehow kept them from timely bringing suit."  *Doe*, 849 N.E.2d at 279 (citation omitted).  Passive actions, for example, Chesapeake merely not coming forward and admitting wrongdoing, are not enough.  *Id.*  Instead, Chesapeake must have committed an affirmative act of concealment, *id.*, one that "exclude[d] suspicion and prevent[ed] inquiry" by Plaintiffs.  *Lutz*, 717 F.3d at 474 (quoting *Bryant v. Doe*, 552 N.E.2d 671, 675 (Ohio Ct. App. 1988)).

Assuming, for the sake of argument, that the allegedly misreported figures on the check stubs constitute a factual misrepresentation that was misleading, and thereby satisfy the first two elements of equitable estoppel, Plaintiffs fail to establish the remaining two.  By their own admission, in fact.  Start with the third element, actual reliance.  Some Plaintiffs did not even read the check stubs they received, meaning they could not have relied upon them.  Those who did read the stubs looked only at the net payment amount, not at the other payment-related data on which they now base their claims.  Here again, Plaintiffs cannot have reasonably relied on alleged misrepresentations they did not read.  Especially so as to Plaintiffs' pricing claims, considering that publicly available market rates for similar gas leases, had Plaintiffs consulted them, would have revealed the alleged underpayment.

Much the same is true as to the fourth element, detrimental reliance. Given Plaintiffs' lack of attention to the check stubs, it is difficult to believe the figures reported there had any detrimental effect on Plaintiffs' behavior. After all, Plaintiffs reviewed only the net payment amount, largely ignoring the stubs altogether, including what they now claim to be the critical fact that the stubs listed the production costs as "$0.00." All told, it was not the stubs that "kept [Plaintiffs] from timely bringing suit." *Doe*, 849 N.E.2d at 279 (citation omitted); *cf. Ohio State Bd. of Pharmacy v. Frantz,* 555 N.E.2d 630, 633 (Ohio 1990) ("The party claiming estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse . . . ."). It was their own conduct.

Failing in these traditional markers, Plaintiffs take a non-traditional path. To their mind, today's case is one of the "compelling cases which justify a departure from established procedure" by tolling the statute of limitations. *Lutz*, 717 F.3d at 474 (quoting *Frees v. ITT Tech. Sch.*, No. 23777, 2010 WL 4323026, at *5 (Ohio Ct. App. 2010)). Why? Because, they say, the alleged underpayment was not apparent from the face of the check stubs. And "doing nothing" (in this case, for over a decade), they add, is "reasonable where nothing suggests to a reasonable person that wrongdoing is afoot."

For support, Plaintiffs cite *Venture Global Engineering, LLC v. Satyam Computer Services, Ltd.*, 730 F.3d 580 (6th Cir. 2013). But that case is nothing like this one. As a legal matter, *Venture Global* applied federal (rather than Ohio) wrongful concealment principles, and thus does not control here. *See Savedoff*, 524 F.3d at 762. And even then, as a factual matter, *Venture Global* involved an extensive fraud scheme, one the defendants followed up on with multiple additional measures designed to dissuade the plaintiffs from investigating any suspected fraud. 730 F.3d at 588–89. Those additional measures ranged from issuing false audit reports to responding to the

6

plaintiffs' fraud inquiries with overt lies—all in the face of scrupulous vigilance by the plaintiffs. *Id.* We thus rejected the defendant's claim-preclusion defense in *Venture Global* because the plaintiffs "would have 'moved heaven and earth' to discover the fraud had they suspected its existence. It was simply too hidden for plaintiffs to have done so." *Id.* at 589.

None of those hallmarks are present here. Through the check stubs, Plaintiffs had before them the volume of gas harvested, the price paid per unit, the allocation of production costs, and the net payment amount. True, if Plaintiffs' claims are believed, both the volumes and allocated production costs were misreported. But Plaintiffs did not review that information. And unlike in *Venture Global*, Plaintiffs had available to them public information regarding gas prices. *Id.* Any dispute about the payment was thus discoverable not by "moving heaven and earth," *id.*, but rather by seeking out public information through the internet or other means. Yet Plaintiffs undertook no investigation—even when information easily accessible to them would have tipped them off to the pricing dispute and perhaps to other possible points of disagreement with Chesapeake regarding the royalty leases. Even measured against this more lenient fraudulent concealment framework, absent some means of diligence, Plaintiffs are not entitled to tolling of the limitations period. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 448 (6th Cir. 2012); *Zemcik v. LaPine Truck Sales & Equip. Co.*, 706 N.E.2d 860, 865 (Ohio Ct. App. 1998) ("Failure to exercise due diligence when documentary evidence is available and known to Zemcik that should put him on notice of fraud does not prevent the running of a fraud statute of limitations.").

Any other conclusion regarding the statute of limitations seemingly would undermine the statute itself, at least as to claims for royalty payments. After all, a similarly idle lessor could always claim that she simply took a defendant at its word in computing royalties. But if "doing nothing" constitutes reasonable due diligence in the context of royalty payments, the limitations

period would always be tolled save for instances where the defendant outright admitted the fraud, or the amount reported on a check stub was so wildly low as to trigger a duty to investigate. Understandably, the Ohio Supreme Court has held otherwise. *Doe*, 849 N.E.2d at 279 (holding that a defendant need not "come forward with further information about [its] wrongdoing" to avoid tolling the limitations period).

We acknowledge that *Venture Global*, in applying the wrongful concealment doctrine, cited favorably to our earlier decision in *Lutz*. But both *Venture Global* and *Lutz* reviewed Plaintiffs' claims against the backdrop of a motion to dismiss. *Venture Global*, 730 F.3d at 585; *Lutz*, 717 F.3d at 464. So, in *Lutz*, we assumed the truth of Plaintiffs' factual allegations, including the claim that Plaintiffs had "no practical way to independently determine the amount of royalty payments due them." 717 F.3d at 464, 471 (internal citations omitted). We likewise assumed that Plaintiffs "relied on—*and therefore presumably read*—the reports and documents that Chesapeake furnished to them." *Id.* at 475 (original alterations omitted) (emphasis added).

With the benefit of discovery, neither of those claims holds up. Plaintiffs did not read the check stubs, and thus could not have relied upon any purported discrepancy in the price or costs listed there, let alone to their detriment. In failing to take even those pedestrian steps, it was Plaintiffs' own conduct that "kept them from timely bringing suit." *Doe*, 849 N.E.2d at 279 (quotations omitted); *see also Smith v. Barclay*, No. 11AP-798, 2012 WL 5378180, at *7 (Ohio Ct. App. Nov. 1, 2012) (rejecting fraudulent concealment claim where the defendant's actions "did not prevent" the plaintiff "from learning about the potential . . . claim"). To the same end, to the extent Chesapeake's alleged fraud was not apparent on the face of the check stubs, the record reveals several avenues through which Plaintiffs could have discovered the alleged underpayments—including an internet search, phone call, or other public inquiry. In this setting,

an Ohio court would not toll the limitations period. *Zemcik*, 706 N.E.2d at 865; *Hoeppner*, 780

N.E.2d at 297. Out of respect for those courts, neither will we.

### III.  CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.

**JANE B. STRANCH, Circuit Judge, concurring in part and dissenting in part.**

I concur in the majority opinion's determination as to the submarket pricing claim in which the price listed on the check stubs was actually used to calculate royalties. The remaining claim (as limited by the litigation) for deducting post-production expenses while reporting $0.00 on the royalty check stub is a different story. The record shows a genuine dispute of material fact over whether Plaintiffs' failure to meet the limitations period for this claim should be excused because Defendant fraudulently concealed deductions it made from royalty payments for production costs. As to that claim, I respectfully dissent.

In our earlier *Lutz* decision, we reviewed whether Plaintiffs had sufficiently alleged a claim for fraudulent concealment. *Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 474–76 (6th Cir. 2013). At that stage, we assumed the truth of Plaintiffs' factual allegations, including the allegation that Plaintiffs "relied on—and therefore presumably read—the reports and documents that Chesapeake furnished to them." *Id.* at 475. We explained that if evidence demonstrated that "a reasonably prudent person would have no way of knowing about the fraud due to the inaccuracies of the report," then equitable tolling based on fraudulent concealment might be warranted. *Id.* at 476. But "[i]f in fact plaintiffs *did* have sufficient information to trigger their duty to investigate, then equitable tolling may not be appropriate." *Id.*

Plaintiffs' allegation that a reasonably prudent person would have no way of knowing of Defendant's deduction misrepresentations finds support in the record. The majority opinion concedes that at least some of the Plaintiffs—five individual landowners and one LLC spread across the Appalachian Plateau—reviewed the check stubs sent to them by Chesapeake. But the opinion draws an inference in Defendant's favor when it concludes that "[t]hose who did read the stubs looked only at the net payment amount, not at the other payment-related data on which they

now base their" deduction claim. To the contrary, viewing the facts in the light most favorable to the Plaintiffs, as we must, the Plaintiffs looked at and relied upon misleading information in the check stubs relevant to their deduction claim. The record reveals that those Plaintiffs who reviewed the check stubs focused on the amount of money being paid. For example, when asked, "what are you looking at on the check stub?," one Plaintiff responded: "How much money is it." Drawing all inferences in Plaintiffs' favor, this interest in the amount of money being paid includes an interest in whether the Defendant deducted money from their royalty payments for post-production costs.

For the time at issue, the check stubs reported Plaintiffs' "share of production costs," i.e. the expenses deducted from the amount being paid, as "$0.00." The record suggests that this information was inaccurate. Defendant's Accounting Manager responsible for the "distribution of royalty revenue in the state of Ohio" declared that "Chesapeake has not charged a pro rata share of post-production costs against the named plaintiffs' royalty payments since September 2005." It is reasonable to infer from this record that before September 2005, Defendant was deducting post-production costs at the same time it was reporting "$0.00" in deductions on the royalty check stubs.

The record, including Plaintiffs' admissions to not reviewing information relevant to their submarket pricing claim and their acknowledgement that they had access to publicly available market rates for similar gas leases, was sufficient to resolve that claim. The deduction claim, and the evidence addressing it is a different matter. No publicly available information would have exposed Defendant's alleged fraudulent concealment in deducting its post-production expenses and the record reveals a limited genuine dispute of material fact over whether Plaintiffs reviewed and relied on the check stubs for information relevant to their deduction claim. This satisfies the standard we set out in our last opinion on this same case—the record shows that "a reasonably

prudent person would have no way of knowing about the fraud due to the inaccuracies of the report." *Lutz,* 717 F.3d at 476. A genuine dispute of material fact thus remains as to whether Defendant's deduction scheme "was simply too hidden for plaintiffs" to have discovered and whether Plaintiffs fairly relied on the inaccuracies of Defendant's reported $0.00 deductions. *Venture Global Engineering, LLC v. Satyam Computer Services, Ltd.*, 730 F.3d 580, 589 (6th Cir. 2013). Because Defendant was not entitled to summary judgment on the deduction claim presented on appeal, I respectfully dissent.